William **ZEHNER**, Jr., Susan Zehner and William Zehner, Sr., Plaintiffs,

v.

**CENTRAL BERKSHIRE REGIONAL SCHOOL DISTRICT, Defendant.**

**Civil Action No. 94–30235–MAP.**

United States District Court, D. Massachusetts.

July 31, 1995.

Marilyn J. Schmidt, Schmidt & Botter, Northampton, MA, for William Zehner and Susan Zehner.

Edward J. McDonough, Jr., Egan, Flanaghan & Cohen, PC, Springfield, MA, for Central Berkshire Regional School District.

PONSOR, District Judge.

Upon *de novo* review, the Report and Recommendation of the Magistrate Judge is adopted in full, and this motion [Plaintiffs' Motion for Summary Judgment] is DENIED. So ordered.

Upon *de novo* review the Report and Recommendation of the Magistrate Judge (not "Clerk Magistrate" as plaintiff terms him) is adopted in full. This motion [Defendant's Cross–Motion for Summary Judgment] is

ALLOWED; the clerk is ordered to enter judgment for defendant.

*REPORT AND RECOMMENDATION WITH REGARD TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Docket No. 17) AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT (Docket No. 23)*

NEIMAN, United States Magistrate Judge.

## I. INTRODUCTION

This case finds its origin in a number of confrontations in the autumn of 1993 between Plaintiff William Zehner, Jr. ("William"), then a student at Wahconah Regional High School in Dalton, Massachusetts, and high school administrators. The result of these confrontations was that William received two three-day suspensions from school, lost his privilege to park his truck in the school lot and was excluded from the soccer team for the remainder of the season.

William and his parents, Susan Zehner ("Mrs. Zehner") and William Zehner, Sr. ("Mr. Zehner"), filed a four-count complaint in this Court generally alleging negligent exclusion from school and violations of due process. Plaintiffs have moved for summary judgment on the constitutional claims. In opposition, Defendant, the Central Berkshire Regional School District (hereinafter "the school"), filed a cross-motion for summary judgment on all of Plaintiffs' claims. The matter has been referred to this Court for a report and recommendation pursuant to Rule 3 of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts. 28 U.S.C.A. § 636(b)(1)(B). For the reasons stated below, the Court recommends that Defendant's motion for summary judgment be allowed and that Plaintiffs' motion for summary judgment be denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This case is best viewed by looking at the three discrete events underlying Plaintiffs' complaint: (i) William's loss of parking privileges in October of 1993; (ii) William's sus-

pension from the soccer team and from school on or about November 1, 1993; and (iii) William's suspension from school on or about November 10, 1993.[1]

## A. LOSS OF PARKING PRIVILEGES

On October 15, 1993, William, a senior at Wahconah Regional High School, was leaving the school parking lot at the end of the day in his pickup truck. William's Affidavit at 1. He was traveling behind another vehicle driven by his friend and fellow student, James Torrey, and in front of the school buses. Id. Torrey's vehicle—which was travelling at an extremely slow speed—delayed the vehicles behind him, including William's truck and the school buses. Complaint at 2. The road upon which the vehicles were travelling is narrow and does not allow for passing. Id.

When William arrived at school the next day, Assistant Principal Richard P. Farley ("Farley") suspended William from using the school parking lot for "intentionally travelling at a low rate of speed to cause the school bus delay." Def.Ex. 1 at 3. In making this decision, Farley invoked the student handbook which states, in part:

> Student cars can only leave from the extreme easterly end of the parking area while the buses are picking up students.... Student cars must not interfere once the buses begin leaving the parking lot.... Infractions of ... parking, traffic and Massachusetts motor vehicle rules will result in the loss of the privilege of bringing a car to school.

Id. (citing Def.Ex. 3 at 36). Although William claims that he was not given a hearing, Complaint at 2, he concedes that he "tried to explain to [Farley] that [he] had neither planned nor participated in the effort to slow the buses," but that Farley was unpersuaded, William's Aff. at 2. Farley did not immediately advise Mr. and Mrs. Zehner of William's loss of driving privileges because William told Farley that his parents were away for several days. Def.Ex. 1 at 3. Later that week, Farley notified the Zehners of the loss of William's driving privileges. Id.

There is a dispute as to the length of time William's parking privileges were suspended. According to William and his father, Farley stated that the suspension was "indefinite." See William's Aff. at 2; and Mr. Zehner's Aff. at 1. Farley claims that he told William that the suspension was for only one week. Def.Ex. 1 at 3.

## B. FIRST SUSPENSION FROM SCHOOL AND SUSPENSION FROM SOCCER TEAM

On or about October 29, 1993, William attended a school dance with his girlfriend. William's Aff. at 2. What exactly occurred at the dance is best detailed in the school's L.R. 56.1 Statement of Material Facts as to Which There is no Genuine Issue to be Tried (Docket No. 24) and, except as specifically indicated below, is uncontested by Plaintiffs.[2]

According to the school, William appeared at the dance exhibiting impaired speech, a strong odor of alcohol and an unsteady gait. Def.L.R. 56.1 Statement at 2; Def.Ex. 1 at 4.

1. The Court's understanding of the facts has been hampered by Plaintiffs' failure to adequately refer to "affidavits, depositions and other documentation" as required by Local Rule 56.1 and by Plaintiffs' reference to certain facts which find no support in the record. Rather than resorting to the drastic remedy of denying Plaintiffs' motion, as provided in the rule, the Court has instead undertaken the task of culling the facts from the exhibits supplied by the parties: Defendant's Answers to the First Set of Interrogatories Propounded by the Plaintiffs, (Defendant's Exhibit 1, hereinafter "Def.Ex. 1"); the November 1, 1993 and November 10, 1993 Notices of Suspension (Defendant's Exhibit 2, hereinafter "Def.Ex. 2"); the Wahconah Regional High School Student Handbook (Defendant's Exhibit 3 and Plaintiffs' Exhibit A, hereinafter "Def.Ex.

3"); the Affidavit of William Zehner (son) (hereinafter "William's Aff."); the Affidavit of William Zehner (father) (hereinafter "Mr. Zehner's Aff."); a copy of William's school schedule; and an April 4, 1994 letter from the school to Plaintiffs' counsel. See EEOC v. Green, 76 F.3d 19, 25 n. 10 (1st Cir.1996). The Court also refers to Plaintiffs' First Amended Complaint (hereinafter "Complaint").

2. Plaintiffs' failure to rebut the school's properly documented factual assertions deems them admitted by Plaintiffs, at least with regard to the school's motion for summary judgment. L.R. 56.1. See Carreiro v. Rhodes Gill & Co., 68 F.3d 1443, 1446 n. 3 (1st Cir.1995); and FDIC v. Anchor Properties, 13 F.3d 27, 31 (1st Cir.1994).

William was observed in this condition in the presence of Farley, Thomas Potter ("Potter"), principal of the school, Patricia Johnson, a class advisor, Robert Aeschback, another class advisor, and Daniel McGinnis and Lynne Ford, local police officers. Def.L.R. 56.1 Statement at 2; Def.Ex. 1 at 4. Farley questioned William as to his appearance and behavior. Def.L.R. 56.1 Statement at 3; Def.Ex. 1 at 4–5. William replied with impaired speech that he had not used alcohol. Def.L.R.Statement at 3; Def.Ex. 1 at 4–5. Potter thereafter advised William that he was being charged with the use of alcohol and gave William the opportunity to respond, whereupon William again denied the use of alcohol. Def.L.R. 56.1 Statement at 3; Def. Ex. 1 at 5. Officer McGinnis then took William's car keys away from him. Def.L.R. 56.1 Statement at 3; Def.Ex. 1 at 5. No attempt was made that evening to contact William's parents. Complaint at 3.

Without specifically disputing the school's description of the events at the dance, William merely claims that he was not drunk. William's Aff. at 2. William also alleges, although the school disputes, that his request to take a breathalizer test was denied. Id. See also Def.Ex. 1 at 5. William concedes that his gait may have been "slightly off," but contends that this was not the result of alcohol use; rather, he asserts, this was due to his playing soccer, refereeing, working out and mowing lawns earlier in the day. William's Aff. at 2. William also concedes that he was told to report to the principal's office when school reconvened in order to discuss the matter. Complaint at 3.

William claims that when he arrived at school the following Monday morning, November 1, 1993, he was informed by his soccer coach that he was off the team for the rest of the season. William's Aff. at 2. William asserts that he then overheard a conversation between Farley and the mother of William's girlfriend concerning the allegation of intoxication at the dance, a conversation that prompted William to call his own mother

and request that she come to the school. Id. At approximately 8:00 a.m., William and Mrs. Zehner met with Farley and Potter concerning the incident at the dance. Id. See also Def.L.R. 56.1 Statement at 3; Def.Ex. 1 at 6.

As with the events of the dance, the school's description of what happened during the Monday morning meeting is largely unrebutted by Plaintiffs. According to the school, William was informed that he had violated school rules by using alcohol while at the dance, was advised that his use of alcohol was in violation of the athletic code and was given an opportunity to reply to the charges. Def.L.R. 56.1 Statement at 3–4. See also Def.Ex. 1 at 6–8; and William's Aff. at 2. At some point, William, or at least his mother, was told that William was going to be suspended from school for three days and, pursuant to the athletic code, would be excluded from the soccer team for the rest of the season. Def.L.R. 56.1 Statement at 4; Def. Ex. 1 at 6–8. William's participation in the meeting ended when William, with his mother apparently still present, called Potter "a fucking prick" and left the office. Id. See also William's Aff. at 2. Mrs. Zehner was advised that she had the right to appeal the suspension to the superintendent. Def. 56.1 Statement at 4; Def.Ex. 1 at 6. At about 11:00 a.m., Farley returned a call to William's father. Mr. Zehner's Aff. at 2. During that conversation, Farley informed Mr. Zehner that William had been suspended from school and the soccer team. Id.

Mr. and Mrs. Zehner were subsequently provided with a written notice, dated November 1, 1993, of William's suspension from school, which began that day and continued through Wednesday, November 3, 1993. Def.L.R. 56.1 Statement at 4. The notice stated that "Bill was suspended from school for coming to a school dance while under the influence of an alcoholic beverage. Bill also left the building without permission at the conclusion of his suspension hearing." See Def.Ex. 2.[3] Mr. Zehner did not receive the

3. The reverse side of the notice explained the due process rights of suspended students:

Short term suspension of a student from school may be invoked by the Principal or Assistant Principal, for a period or up to (not including) ten (10) days. Due process for short term suspension includes a hearing before suspension, in which the student facing short term suspension is given oral or written notice of the charge(s) against him/her, an

written notice until Thursday, November 4, 1993. Mr. Zehner's Aff. at 2.

## C. SECOND SUSPENSION FROM SCHOOL

On November 10, 1993, a teacher found William in the school hallway, questioned him and concluded that he had skipped a study hall. Def.L.R. 56.1 Statement at 5; Def.Ex. 1 at 9–10. William then became hostile and disrespectful to the teacher and was brought into Farley's office. Def.L.R. 56.1 Statement at 5; Def.Ex. 1 at 9. William asserts that Farley informed him that he was being suspended for skipping study hall and for being hostile to the teacher, but contends that Farley refused to consult William's schedule to verify that he was not scheduled for study hall. See William's Aff. at 3 and Exhibit thereto (William's class schedule). William does not, however, dispute the school's contention that he was given the opportunity to rebut the accusation, that he denied that he had cut class and threatened a teacher, that he continued his disruptive and threatening behavior in front of Farley, that he later threatened the teacher again saying, "That's it buddy, I am going to get you! I am going to sue you!" and that Farley ultimately called the police because he feared William would physically harm people. Def.L.R. 56.1 Statement at 5–6; Def.Ex. 1 at 9. Nor does William dispute Farley's claim that William threatened the police officer who came to the school by stating, "You think you are so tough, why don't you take off your badge." Def.L.R. 56.1 Statement at 6; Def.Ex. 1 at 10.[4]

As a result of his conduct on November 10, 1993, William was suspended for three days, from November 12th through November 15th. Def.L.R. 56.1 Statement at 6. Written notice of the suspension was provided to William and mailed to his parents on November 10th, Def.Ex. 2, although Mr. Zehner claims he did not receive the notice until November 15th, Mr. Zehner's Aff. at 2. The notice indicated that William was being suspended "for cutting study hall and for being belligerent and threatening a teacher" and that William "continued to be uncooperative with the school administration and Officer Dan Casey of the Dalton Police Department." Def.Ex. 2. The reverse side was identical to the notice mailed on November 1st. Id.

Following the November 10th suspension, William withdrew from the school and enrolled in the National Sports Academy in Lake Placid, New York. See William's Aff. at 3; Complaint at 4. William claims to have had no discipline problems in high school or college ever since. William's Aff. at 3.

## D. PROCEDURAL BACKGROUND

Plaintiffs took no action to appeal William's various suspensions until March of 1994, when their counsel wrote to the school's superintendent voicing their concerns. Mr. Zehner's Affidavit at 2. On March 24, 1994, Mr. and Mrs. Zehner and their counsel attended a School Committee meeting on this issue. Id. In response to Plaintiffs' correspondence and the meeting, the superintendent affirmed the suspensions. See Exhibit to id. (April 4, 1994 letter from the school's

explanation of the basis of the accusation(s) and an opportunity to present his/her version of the facts. If suspension is invoked by the administration after such hearing, the parents or legal guardians of the suspended student will be invited to confer with the administration. . . .
. . . For suspensions of ten (10) days or less consecutive school days, only an informal hearing is required. A formal appeal procedure does not exist, although a student may request a review by the Superintendent. . . . Id.

4. Plaintiffs' counsel, in opposing the school's motion, attempts to construct a factual dispute by stating that it will be shown "[a]t trial" that: (i) the first words out of Farley's mouth when Wil-

liam arrived at the office were "You're out of here!"; (ii) Farley called the police because of an altercation between him and another student, not between him and William; and (iii) Farley tried to detain William in his office after the police left. Counsel has failed, however, to document these allegations and, when asked at hearing to direct the Court to the source of these assertions, indicated that everything was included in the file. After carefully poring through the entire file, the Court is unable to find any support for these assertions. Accordingly, they have been given no weight. See *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 427 (1st Cir.1996) (in scrutinizing summary judgment record, court must disregard unsupported speculation).

superintendent to Plaintiffs' counsel). Plaintiffs filed this action on October 17, 1994.

### III. SUMMARY JUDGMENT STANDARD

■ Summary judgment is appropriate where the record reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The facts must be viewed in a light most favorable to the non-moving party. *Santiago–Ramirez v. Secretary of Dep't of Defense of the United States,* 62 F.3d 445, 446 (1st Cir.1995). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.,* 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). The factual dispute claimed by the non-moving party must be "material" and the dispute over it "genuine." A "genuine" issue is one that only a finder of fact can properly resolve because it may reasonably be resolved in favor of either party and a "material" issue is one that affects the outcome of the suit. *Collins v. Martella,* 17 F.3d 1, 3 n. 3 (1st Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 250, 106 S.Ct. 2505, 2510, 2511, 91 L.Ed.2d 202 (1986)). Mere allegations or conjecture unsupported in the record are insufficient to raise a genuine issue of material fact. *Horta v. Sullivan,* 4 F.3d 2, 11 (1st Cir.1993). Absent a genuine dispute of material fact, questions of law are appropriate for resolution on summary judgment. *Jimenez v. Peninsular & Oriental Steam Nav. Co.,* 974 F.2d 221, 223 (1st Cir. 1992).

■ The mere fact that both parties move for summary judgment does not change the foregoing analysis. *United Paperworkers Intern. Union Local 14, AFL–CIO–CLC v. International Paper Co.,* 64 F.3d 28, 32 n. 2 (1st Cir.1995). Barring special circumstances, the Court must consider each motion separately, drawing inferences against each

movant in turn. *EEOC v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 608 n. 8 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995).

### IV. DISCUSSION

The complaint brought by William and his parents sets forth four counts. In Count I, Plaintiffs allege that William was negligently excluded from school. Count II asserts a violation of the due process clause of the United States constitution. Count III claims that William's state constitutional rights were violated. And in Count IV, Plaintiffs seek a declaration of William's substantive and procedural rights.

Although the school seeks summary judgment as to all the counts, Plaintiffs' motion is directed only to Counts II, III and IV. This distinction, however, is without moment. First, the record discloses no trial worthy issue of material fact, disregarding of course conclusory allegations and unsupported speculations. Second, even when indulging all reasonable inferences in Plaintiff's favor, the Court finds that, when viewing the facts most favorably to Plaintiffs with respect to *all* the counts, no reasonable jury could find for Plaintiffs on any one. Accordingly, as explained below, the Court believes that the school is entitled to summary judgment on each count of Plaintiff's complaint and, concomitantly, that Plaintiffs' motion for summary judgment must fail.

### A. DUE PROCESS

The essence of Plaintiffs' argument concerning Counts II, III and IV is that William's various suspensions were administered without the school's first fulfilling the constitutional requirements of due process. The Court notes, however, that Count I—which alleges negligent exclusion from school—also appears to raise, and has been treated by the school as raising, a due process claim.[5] To the extent that Count I does in fact allege a violation of due process, it is subject to the analysis in this section. To the extent that

---

5. The focal paragraph of Count I states: "The Defendant violated [a] duty [of care] on or about October 15, 1993, October 30, 1993 and November 10, 1993, *by suspending [William] without just cause and without a fair opportunity to be heard."* Complaint at 5 (emphasis added).

Count I alleges violations of other rights, it is addressed below in section B.

■ As the First Circuit has explained, "the deprivation by state action of a constitutionally protected interest in 'life liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Brown v. Hot, Sexy & Safer Productions, Inc.*, 68 F.3d 525, 534 (1st Cir.1995) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990)) (emphasis added by First Circuit), *petition for cert. denied*, ─ U.S. ─, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996). In applying this prohibition, a court must engage in a two-stage analysis. First, a court must determine whether the asserted interest is one of "life, liberty or property." If not, the analysis ends. If, however, a constitutionally protected interest is implicated, a court must determine whether the individual was afforded the "due process of law." See *id.* (citing *Ingraham v. Wright*, 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977)). With this framework in mind, the Court looks at each of William's claimed deprivations in turn: the two three-day suspensions from school, the loss of parking privileges, and the exclusion from the soccer team.

### 1. The Suspensions from School

As indicated, William was twice suspended from school in November of 1993. Each suspension from school was for three days and each is challenged by Plaintiffs as having been administered without due process of law.

### a. The Legal Framework

■ There is no question that a student's interest in pursuing an education is included within the protections of "liberty" and "property." *Gorman v. University of Rhode Island*, 837 F.2d 7, 12 (1st Cir.1988) (citing *Goss v. Lopez*, 419 U.S. 565, 574–75, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975)). Thus, a student who is faced with suspension from school is entitled to the protections of due process. *Id.* See also *Goss*, 419 U.S. at 575–76, 95 S.Ct. at 737. This, however, does not end the inquiry. As the Supreme Court has

stated, "[o]nce it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). See also *Gorman*, 837 F.2d at 12.

■ Since each of the instant suspensions from school was for less than ten days, the Court is dealing with the kind of temporary suspension at issue in *Goss*. Accordingly, William was entitled to (i) notice, either oral or written, of the charges against him, (ii) an explanation of the evidence, and (iii) an opportunity to present his side of the story. See *id.*, 419 U.S. at 581, 95 S.Ct. at 740; and *Donovan v. Ritchie*, 68 F.3d 14, 17 (1st Cir. 1995). According to the Supreme Court, "[i]n the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Goss*, 419 U.S. at 582, 95 S.Ct. at 740. However, in order for the student "to explain his version of the facts at this discussion, [he should] first be told what he is accused of doing and what the basis of the accusation is." *Id.* "Requiring that there be at least an informal give-and-take between student and disciplinarian," gives the student, at a minimum, "the opportunity to characterize his conduct and put it in what he deems the proper context." *Id.*, 419 U.S. at 584, 95 S.Ct. at 741. See *Donovan*, 68 F.3d at 17.

*Goss* is not limitless. The Supreme Court phrased the procedural requirements for short term suspensions as "rudimentary precautions" and refrained from imposing anything more on schools:

> We stop short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident. Brief disciplinary suspensions are almost countless. To impose in each such case even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational

effectiveness. Moreover, further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process.

*Id.,* 419 U.S. at 581, 583, 95 S.Ct. at 740–41. See also *Gorman,* 837 F.2d at 14; and *Bethel School District v. Fraser,* 478 U.S. 675, 686, 106 S.Ct. 3159, 3166, 92 L.Ed.2d 549 (1986) ("Two days' suspension from school does not rise to the level of a penal sanction calling for the fully panoply of procedural due process protection applicable to a criminal prosecution."). Further, even though the Supreme Court established the "general rule" that notice and hearing precede the student's removal from school, it left open "recurring situations in which prior notice and hearing cannot be insisted upon." Thus, "[s]tudents whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school ... [with] the necessary notice and rudimentary hearing ... follow[ing] as soon as practicable." *Goss,* 419 U.S. at 582–83, 95 S.Ct. at 740.

### b. The First Suspension from School

Turning to William's first three-day suspension from school, there is no question that he was given more than adequate notice of the charges against him. At the dance, and again at the November 1st meeting, William was advised that he would be charged with the use of alcohol. Nor is there a dispute that William was given an explanation of the evidence against him and an opportunity, if not at least two opportunities, to be heard prior to being suspended. Thus, Plaintiffs do not dispute that, at the dance, William was questioned by school officials as to his appearance and behavior and given an opportunity, at that time, to present his side of the story, whereupon he denied that he had used alcohol. Plaintiffs also do not challenge, and indeed concede in their complaint, that, before William left the dance, he was given an additional opportunity "to report to the principal's office the first thing in the morning to discuss the matter." In fact, he took advantage of that opportunity the following Monday morning when he and his mother met with Farley and Potter prior to the actual suspension taking place later that day.

Plaintiffs have cited no law, and the Court has found none, which would indicate that notice to a student in such circumstances is inadequate unless it is provided to the student's parents as well. Rather, "when a student is suspended, it is the student who is entitled to due process because it is the student—not his parents—who has a right to a free public education." *Boster v. Philpot,* 645 F.Supp. 798, 807 (D.Kan.1986) (citing *Goss,* 419 U.S. at 581, 95 S.Ct. at 739). Thus, it is questionable whether the Zehners even have standing to assert that their own due process rights were violated.

In any event, such an inquiry is unnecessary where, as here, there is no dispute that Mrs. Zehner participated in the suspension hearing on Monday morning. In addition, Mr. and Mrs. Zehner were informed in writing that William would be suspended for three days for coming to the dance while under the influence of alcohol as well as for leaving the school without permission. The school's combination of both oral *and* written notice to both William *and* his parents went beyond the Supreme Court's requirement that "the *student* be given oral *or* written notice of the charges against him." *Goss,* 419 U.S. at 581, 95 S.Ct. at 740 (emphasis added). It makes no difference that the Zehners may have received the written notice after the suspension was fully served.

Assuming the adequacy of the notice, Plaintiffs nonetheless assert that the various hearings were not meaningful. First, Plaintiffs contend that the November 1, 1993 meeting between William, Mrs. Zehner, Farley and Potter was inadequate because Farley and Potter, as alleged witnesses to the dance incident, were not impartial decision makers. Second, Plaintiffs allege that the November 1st meeting was a "sentencing" rather than a "fact-finding" hearing.

As for Plaintiff's first claim, the *Gorman* case on which they principally rely, provides little support. Indeed, on the facts before it, the First Circuit in *Gorman* found a lack of evidence of bias or prejudice to show that

fundamental fairness was undermined even though there was prior contact between the participants. *Id.*, 837 F.2d at 15. Further, the only other case cited by Plaintiffs on this point, *Strickland v. Inlow*, 519 F.2d 744, 746 (8th Cir.1975), is inapposite. Unlike William, the students in *Strickland* were suspended for the balance of the semester and, most significantly, were not informed of the time and place of the meeting at which their suspensions were discussed and approved. In addition, the Supreme Court itself, when it announced the *Goss* rule, recognized that there are often situations "where the disciplinarian himself has witnessed the conduct forming the basis for the charge." *Id.*, 419 U.S. at 584, 95 S.Ct. at 741. Finally, Plaintiffs fail to offer any evidence—other than Potter and Farley's mere presence at the dance—to meet their burden of overcoming the presumption that Farley and Potter acted fairly. As in *Gorman*, Plaintiffs' contention that the administrators' various roles or "multiple hats" are evidence of bias "assumes too much" and is thus insufficient to overcome the presumption that William was afforded a fair hearing. *Gorman*, 837 F.2d at 15 (citing *Richardson v. Perales*, 402 U.S. 389, 410, 91 S.Ct. 1420, 1432, 28 L.Ed.2d 842 (1971)). In this vein, Plaintiffs fatally omit the fact that, in addition to Farley and Potter, William was also observed at the dance by non-decision makers, namely, Robert Aeschback, Patricia Johnson, Daniel McGinnis and Lynne Ford.

■ Plaintiffs' second argument fares no better. Although Plaintiffs cite no evidence for their allegation that the November 1st meeting was really a "sentencing," they intend perhaps to rely on William's affidavit which states (i) that, when William arrived at school on November 1st, he was told by his soccer coach that he was off the team for the rest of the season, and (ii) that, when William and Mrs. Zehner met with Farley and Potter, they were "informed" that he was to be suspended for three days before any discussion took place. The Court finds, however, that these allegations fail to raise genuine or material facts sufficient to overcome summary judgment. Thus, even assuming the scenario suggested by William's affidavit, Plaintiffs concede that William was given ample opportunity at the dance to respond to the charge of intoxication being leveled against him. Further, when William and his mother met with Farley and Potter on Monday morning, there was at least some give and take in the discussion. Moreover, Plaintiffs have not addressed the alternative written reason given for the suspension—that William left the school building without permission at the conclusion of the November 1st meeting—or explained William's use of vulgarity, perhaps because the student handbook lists both such offenses as suspendable. See Defendant's Exhibit 3 at 48 ("Suspension ... from school may result if a student ... use[s] ... vulgar and offensive terms in public discourse [or] ... leav[es] school grounds without the permission of the school administrator.").

Similarly, Plaintiffs have offered no evidence, other than unsupported speculation, linking the soccer coach's statement to any implied discussion between the coach and the school administrators. There is nothing to suggest that the soccer coach's statement was grounded on a pre-ordained suspension. In fact, the athletic code itself, independent of other suspension provisions, calls for the suspension from all athletic competition for the current sport season for the use or possession of alcohol in or out of school. (The athletic code—signed by both William and Mrs. Zehner in the summer of 1993—is attached to Def.Ex. 1).

In sum, the Court finds no genuine or material factual issue to indicate that William was not given a meaningful opportunity to be heard prior to his suspension from school on November 1, 1993. Even stretching the facts and their inferences in Plaintiff's favor, no reasonable jury could find that William's first suspension from school was administered without due process.

*c.  The Second Suspension from School*

■ As with the first suspension, there is no question that William was notified of the charges and the underlying evidence when he was again suspended from school on November 10, 1993. Both Farley and the teacher who found William in the hallway told Wil-

liam that he was being charged with skipping study hall. In addition, Farley informed William that he was also being charged with being hostile toward the teacher. Finally, each of these charges, as well as the charge of being uncooperative with the police officer, were evidenced by the observations of the teacher and of Farley and were memorialized in the written notice which was mailed to the Zehners.[6]

Again, the only issue warranting discussion is whether the school provided William a meaningful opportunity to be heard. According to Plaintiffs, a brief inquiry into William's schedule would have shown that he was not scheduled for study hall and thus could not have skipped it. Thus, Plaintiffs argue, "the meeting was not a serious attempt to learn the relevant facts." Plaintiff's Memorandum of Law at 17. Such speculation, however, is insufficient to survive the school's motion particularly where, as here, Plaintiffs do not dispute the school's factual assertion that, when he met with William, Farley gave William the opportunity for rebuttal and that William denied that he had cut class or had threatened a teacher. Even William states in his affidavit that he had the opportunity to give an explanation, to the teacher at least, that he "was scheduled for music, not study hall."

The give-and-take between William and the administrator prior to his second suspension from school, at the very least, amounted to "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Goss,* 419 U.S. at 581, 95 S.Ct. at 740. The Court itself need not consider any factual error which may have been made in the exercise of the administrator's decision. As the Supreme Court has recognized, court review of disciplinary decisions is limited:

> It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. Public high school students do have substantive

and procedural rights while at school. But [42 U.S.C.] § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations. The system of public education that has evolved in this nation relies necessarily on the discretion and judgment of school administrators and school board members and § 1983 was not intended to be a vehicle for federal correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

*Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975) (citations omitted). That the administrator may have relied on an incorrect factual predicate does not doom the procedural rights the school afforded William.

As a final matter, the Court finds meritless any suggestion that, for either the first or second suspension from school, William or his parents should have been given one to five days advanced notice in order to call their own witnesses or otherwise more fully prepare. As already indicated, requiring such cumbersome procedures is at odds with the goals of school administration and has been squarely rejected by the Supreme Court. *Goss,* 419 U.S. at 583, 95 S.Ct. at 740–41. Accordingly, the Court finds that William was not denied due process either time he was suspended from school.

### 2. Loss of Parking Privileges

In *Goss,* the Supreme Court extended the requirement of notice and a rudimentary hearing as a precondition to most short-term suspensions from school because education was "perhaps the most important function of state and local governments." *Id.,* 419 U.S. at 576, 95 S.Ct. at 737 (quoting *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954)). According to the Court, "the total exclusion from the educational process for more than a trivial period, and certainly if the suspension

---

**6.** Given that William's continued disruption arguably posed a "continuing danger," the school could have decided to immediately suspend William prior to giving any rudimentary procedure.

See *Goss,* 419 U.S. at 582–83, 95 S.Ct. at 740. The Court, however, need not reach this issue since William was suspended *after* he was given notice.

is for 10 days, is a serious event in the life of the suspended child." *Id.* There is, however, no suggestion in *Goss* that the Court ought to extend the protections of due process to the less significant interest in the use of a school parking lot, an interest which is most likely *de minimis.* See *id.* See also *Rose v. Nashua Bd. of Educ.,* 679 F.2d 279, 281–82 (1st Cir.1982).

Here, similar to a school's suspending certain bus routes because of the disruption caused by several students, *Rose,* 679 F.2d at 281, the decision to revoke William's parking privileges is hardly a "permanent loss of transportation." In the words of then Judge Breyer:

> The maximum harm is the inconvenience ... of a car pool, a long walk, or some other private transportation arrangement for five days in the school year. This is hardly a "grievous loss," or the deprivation of a particularly important right, privilege or opportunity. No one claims a reputational injury. And, there is no great principle at stake (as, for example, in cases dealing with voting rights, environmental issues, or public assistance), that might make the harm more important than, at first glance, it appears.

*Id.* at 281–82 (citations omitted). Although the loss in *Rose* was for only five days, the Court need not resolve the immaterial dispute here as to whether William's loss of parking privileges was for one week, as claimed by the school, or for an indefinite period of time, as alleged in William's affidavit. In either event, there is no evidence that the loss was "grievous."

Further, even were William's parking privileges entitled to constitutional protection, William's affidavit belies any claim that he was denied due process of law. According to that affidavit, William concedes that (i) he was notified that he would lose his right to park, (ii) he was told that the reason for his deprivation was because he had slowed the buses, and (iii) he was given the opportunity "to explain to [Farley] that he had neither planned nor participated in the effort to slow the buses." Due process was served.

### 3. Exclusion from the Soccer Team

■ Finally, Plaintiffs claim that the decision to exclude William from the soccer team infringed upon a property or a liberty interest. The school, on the other hand, asks the Court to find, as a matter of law, that William's membership on the soccer team is a *de minimis* interest not protected by due process.

Looking at the soccer suspension in a vacuum, the Court aligns itself with the majority of circuits, including the First, that have concluded that a student's interest in taking part in interscholastic athletics only "amounts to a mere expectation rather than a constitutionally protected claim of entitlement." *Walsh v. Louisiana High School Athletic Ass'n,* 616 F.2d 152, 159 (5th Cir. 1980), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981). See, e.g., *Hebert v. Ventetuolo,* 638 F.2d 5 (1st Cir.1981); *Hardy v. University Interscholastic League,* 759 F.2d 1233 (5th Cir.1985); *Hamilton v. Tennessee Secondary School Athletic Assn.,* 552 F.2d 681 (6th Cir.1976); *Rutledge v. Arizona Bd. of Regents,* 660 F.2d 1345 (9th Cir.1981), *aff'd on other grounds,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983); *Albach v. Odle,* 531 F.2d 983 (10th Cir.1976); and *Davenport v. Randolph County Bd. of Educ.,* 730 F.2d 1395 (11th Cir.1984). While William's participation in soccer was no doubt important enough for him to leave Wahconah and enroll in the National Sports Academy, that importance does not trigger a constitutional entitlement. Indeed, even had William claimed an interest in a future professional athletic career, which he has not, such a claim would "nevertheless be considered speculative and not of constitutional dimensions." *Colorado Seminary v. NCAA,* 417 F.Supp. 885, 895 (D.Colo.1976). See also *Parish v. NCAA,* 506 F.2d 1028, 1034 n. 17 (5th Cir.1975); and *Hawkins v. NCAA,* 652 F.Supp. 602, 611 (C.D.Ill.1987).

■ The Court looks briefly at an argument implied, although not explicitly made by Plaintiffs—that William's exclusion from the soccer team, when added to the two three-day suspensions from school and the loss of parking privileges, falls outside of *Goss* and requires a higher degree of proce-

dural formality. The First Circuit, however, was unpersuaded when a similar argument was made in *Donovan*, where a high school student was given a ten-day suspension from school and excluded from various extracurricular activities for his role in distributing an obscene document at school:

> We are not unmindful of the impact of sanctions other than suspension and expulsion. As the Court in *Goss* recognized, there may be "unusual situations, although involving only a short suspension, [where] something more than the rudimentary procedures will be required." But the mere fact that other sanctions are added to a short suspension does not trigger a requirement for a more formal set of procedures. In *Goss* itself one of the plaintiffs had not only been suspended, but had been transferred to another school. What must remain the focus is whether the student was given the opportunity to present his version of what occurred.

*Id.*, 68 F.3d at 18 (citations omitted).

Thus, suspension from participation in athletics does not wear a constitutionally protected cloak simply because it is linked to suspension from school. Here, as in *Donovan*, there is nothing to suggest that William was denied the opportunity to present his side of the story with regard to the incident at the dance. As shown, due process was afforded not only by the November 1st meeting with Farley, but by the give-and-take on the night of the dance.

For the above reasons, the Court recommends that the school's motion for summary judgment, insofar as it pertains to Counts II, III and IV, be allowed. In addition, to the extent that Count I duplicates the constitutional claims made in Counts II, III and IV, Plaintiffs have failed as well to demonstrate that William was denied the due process of law and Defendant is entitled to summary judgment.

## B. *NEGLIGENT EXCLUSION FROM SCHOOL*

While somewhat duplicative of the due process claims of Counts II, III and IV, Plaintiffs' Count I—alleging the negligent exclusion from school—arguably implies, by its "just cause" language, that William's various suspensions were substantively, if not procedurally, inadequate. See n. 5, *supra.* Although Plaintiffs fail to directly address Count I's substantive allegations, they do argue that William's suspensions from school were not supported by the student handbook. For example, Plaintiffs claim that the student handbook did not authorize the school to revoke William's parking privileges because William was not on academic or disciplinary probation. Plaintiffs also allege that the appropriate remedy for William's alleged drinking prior to the dance was, according to the handbook, not suspension from school, but ejection from the dance. Finally, Plaintiffs point to that part of the handbook which states that "[w]henever possible, the student's parent or guardian will be informed of the suspension prior to the student's departure from school."

As indicated above, the Court's review of such matters is limited. See *Wood,* 420 U.S. at 326, 95 S.Ct. at 1003. However, if for no other reason than to provide a comprehensive report and recommendation, the Court finds Plaintiffs' substantive allegations lacking. First, the Court finds little merit in the contention that a student can be excluded from the parking lot only if he is already on academic or disciplinary probation. The handbook is clear and unambiguous: infractions of parking and traffic rules "will result in the loss of the privilege of bringing a car to school." Def.Ex. 3 at 36.

Second, the handbook does not limit the school, as Plaintiffs suggest, to barring an allegedly drunk student from attending a school sponsored activity such as a dance. This disciplinary action is in *addition* to the imposition of a three to five-day suspension from school—and, if the student is on an athletic team, suspension from all competition for the current season—for using or possessing alcohol. Id. at 17–18, 40, 42. Indeed, the penalty of suspension from an athletic team was reiterated in the athletic code signed by both William and his mother. Compare, *Hasson v. Boothby,* 318 F.Supp. 1183, 1188 (D.Mass.1970) (students' rights under due process clause were not violated by imposition of one year probation from

school and athletics even though no prior published rule forbade students' presence on school premises with beer on their breaths). Moreover, William was suspended on November 1, 1993 not only for drinking but for leaving school without permission at the conclusion of his suspension hearing, and, could potentially have been suspended for using a vulgar term in public discourse.

Third, although the school tries to inform a student's parents of an impending suspension prior to the student's departure from school "[w]henever possible," such notice is neither required by the student handbook nor, as indicated, constitutionally mandated. In any event, at least for the first suspension from school, William's mother participated in the November 1st disciplinary hearing. In short, there is nothing in Count I which convinces the Court that it should somehow independently survive summary judgment.

### C. PLAINTIFFS MOTION FOR SUMMARY JUDGMENT

The Court, in considering the school's motion for summary judgment, has construed the facts and the inferences derived therefrom in a light most favorable to Plaintiffs. Even under this deferential standard, however, the Court, as demonstrated, finds that the school is entitled to summary judgment on every count of the Complaint. Accordingly, Plaintiffs' motion for summary judgment is, perforce, untenable and the Court recommends that it be denied.

### V. CONCLUSION

For the foregoing reasons the Court recommends that Plaintiffs' Motion for Summary Judgment (Docket No. 17) be DE-

NIED and that the school's Cross–Motion for Summary Judgment (Docket No. 23) be ALLOWED.[7]

DATED: February 26, 1996

**7.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within ten (10) days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. See *Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); and *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983). See also *Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.