**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JENNIFER WOFFORD; M.D., a minor
child, by her mother and next friend
Jennifer Wofford,
                    *Plaintiffs-Appellants,*

v.

RITA EVANS; ERIKA ROSA;
BOTETOURT COUNTY SCHOOL BOARD;
JASON MARKHAM, and other
unknown agents of the Botetourt
County Sheriff's Department,
                    *Defendants-Appellees.*

No. 03-2209

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Jackson L. Kiser, Senior District Judge.
(CA-02-762-7)

Argued: September 28, 2004

Decided: November 19, 2004

Before WILKINSON and WILLIAMS, Circuit Judges,
and Roger W. TITUS, United States District Judge
for the District of Maryland,
sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Williams and Judge Titus joined.

## COUNSEL

**ARGUED:** Terry N. Grimes, Roanoke, Virginia, for Appellants. Elizabeth Kay Dillon, GUYNN, MEMMER & DILLON, P.C., Roanoke, Virginia, for Appellee Jason Markham; Charles Robison Allen, Jr., Roanoke, Virginia, for Appellees Rita Evans, Erika Rosa, and Botetourt County School Board. **ON BRIEF:** Jim H. Guynn, Jr., GUYNN, MEMMER & DILLON, P.C., Roanoke, Virginia, for Appellee Jason Markham.

---

## OPINION

WILKINSON, Circuit Judge:

One Wednesday afternoon, several students at Colonial Elementary School reported to their teacher that M.D., a ten-year-old classmate, had brought a gun to school. During the ensuing investigation, school administrators twice held M.D. in the principal's office for questioning. During the second detention, law enforcement officers also quizzed the child. M.D.'s mother, Jennifer Wofford, was not contacted until the police had departed.

Wofford claims that the school's failure to notify her violated her rights to due process under the Fourteenth Amendment. She also alleges that the detainments violated M.D.'s Fourth Amendment right to be free from unlawful seizures. The district court dismissed these claims.

We now affirm. School officials must have the leeway to maintain order on school premises and secure a safe environment in which learning can flourish. Over-constitutionalizing disciplinary procedures can undermine educators' ability to best attain these goals. Imposing a rigid duty of parental notification or a per se rule against detentions of a specified duration would eviscerate the ability of administrators to meet the remedial exigencies of the moment. The Constitution does not require such a result.

## I.

An order dismissing a claim under Fed. R. Civ. P. 12(b)(6) and an award of summary judgment are reviewed de novo. We apply the same legal standard as the court below and construe the evidence in the light most favorable to the non-movant. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).

On the eve of Thanksgiving in 2001, a teacher at Colonial Elementary School in Botetourt County, Virginia, called Assistant Principal Rosa with some disquieting news. Several students had reported that their classmate M.D. had brought a gun to school. Rosa immediately located the accused pupil and escorted her to the assistant principal's office. In the office, Rosa repeatedly questioned M.D. about the allegation. M.D. permitted Rosa to search her book bag and her classroom desk. Finding no weapon, Rosa escorted M.D. to the school bus that was waiting for her.

On the Monday following Thanksgiving, the assistant principal, now accompanied by Principal Evans, continued to investigate the incident. The two principals spoke with the children who had initially made the allegation. Several of them maintained that M.D. had brought a weapon to school the week before. One of these pupils, Josh Bane, said he had seen M.D. throw a black handgun into the woods adjoining the school. Their concerns rekindled, the school officials contacted the police. Rosa and Evans summoned M.D. to the office once more and renewed their inquiries about the weapon. During the questioning, M.D. complained of nausea and requested the presence of her mother. Neither school official obliged, however, and the investigation continued.

Three detectives arrived at the school in the middle of the morning. They spoke with M.D.'s four accusers before interviewing the student herself in the assistant principal's office. In the presence of the school officials, they quizzed M.D. about the allegation once more. In response to the officers' inquiries, the pupil repeatedly denied bringing a gun to school. On several occasions she asked for her mother, but the officers and school officials did not contact Wofford. M.D. even alleges that her interviewers ignored her request to visit the rest-

room. While two officers continued their interrogation, Detective Markham sought out Josh Bane. Bane showed the officer and Rosa where he saw M.D. discard the gun. Markham swept the school grounds for a weapon, but found nothing.

Rosa, Evans, and Markham recall the questioning lasting about fifteen minutes. M.D., by contrast, claims to have been with the police for at least an hour and a half. Despite M.D.'s requests, her mother was not contacted while the police were at the school. On his way back to the station, Markham called Wofford to inform her that her daughter had spoken to the police. M.D.'s mother arrived at the school shortly after receiving this news. She waited a further forty minutes before retrieving her daughter from the principal's office.

Wofford and M.D. filed suit against Evans, Rosa, the Botetourt County School Board, Markham, and other unknown officers of the county sheriff's department. They pressed several constitutional claims under 42 U.S.C. § 1983 (2000). First, they asserted that the school's disciplinary procedures violated Wofford's right to due process under the Fourteenth Amendment. Second, they claimed that M.D. had been seized by school officials and police officers in violation of the Fourth Amendment.[1]

---

[1]Wofford and M.D. made four additional claims. First, they alleged a free-standing violation of 42 U.S.C. § 1983. The district court dismissed this claim because § 1983 creates no substantive rights by itself. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994). Second, they claimed that, under the common law, Evans and Rosa acted unreasonably in failing to contact Wofford prior to her daughter's interrogation. The district court dismissed this claim on state-law grounds. Third, they asserted that M.D.'s questioning in the absence of counsel violated her rights under the Sixth Amendment. The Sixth Amendment right to counsel, however, attaches only at the inception of formal criminal proceedings. *See Kirby v. Illinois*, 406 U.S. 682, 688-89 (1972). Finally, they alleged that M.D.'s interrogation violated her procedural due process rights. Before a suspension of up to ten days, however, a school official must only notify the pupil of the charge, explain the evidence supporting it, and offer the student an opportunity to respond. *See Goss v. Lopez*, 419 U.S. 565, 581 (1975). These prescriptions were met here. Since they satisfy due process for the greater deprivation of a ten day suspension, the procedures must

The district judge dismissed the due process claim pursuant to Fed. R. Civ. P. 12(b)(6). He permitted the Fourth Amendment claim to proceed but eventually dismissed it on summary judgment. Wofford and M.D. press both claims on appeal.

## II.

It is now a commonplace that students do not "shed their constitutional rights . . . at the schoolhouse gate." *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). But the Supreme Court has never held that the "full panoply of constitutional rules applies with the same force and effect in the schoolhouse as its does in the enforcement of criminal laws." *New Jersey v. T.L.O.*, 469 U.S. 325, 350 (1985)(Powell, J., concurring). Indeed, school officials have been afforded substantial leeway to depart from the prohibitions and procedures that the Constitution provides for society at large. *See, e.g.*, *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 683 (1986) (permitting the punishment of a public school student for using lewd speech); *T.L.O.*, 469 U.S. at 340-42 (declining to require a warrant supported by probable cause for searches of students by school officials); *Ingraham v. Wright*, 430 U.S. 651, 678-80 (1977)(finding no constitutional requirement of notice or a hearing prior to the administration of corporal punishment).

Such leeway is particularly necessary when school discipline is involved. The Court has noted the "substantial interest of teachers and administrators in maintaining discipline in the classroom." *T.L.O.*, 469 U.S. at 339. Educators must be able to respond effectively to the disciplinary exigencies of the moment. They must also be able to tailor these responses to the peculiar remedial needs that exist in particular schools. The Supreme Court has long recognized that educators are best situated to identify those needs and optimize their implemen-

---

also pass muster for the lesser deprivation that M.D. suffered. The appellants do not dispute the district court's disposition of these additional claims. On appeal, Wofford and M.D. occasionally suggest a violation of M.D.'s Fifth Amendment right against self-incrimination. But this right is implicated only when evidence is proffered during a criminal trial. *See Riley v. Dorton*, 115 F.3d 1159, 1164-65 (4th Cir. 1997).

tation. The "education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not of federal judges." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

With these injunctions in mind, we decline to announce a requirement of parental notification or a ban on detentions of a certain length when school officials are investigating a serious allegation of student misconduct. Such strictures would be particularly inappropriate when, as here, several students corroborate the accusation and an eyewitness shows the investigators where the transgression occurred.

The appellants' proposed rules would force educators to choose between abandoning their preferred method of discipline altogether or complying with burdensome procedures decreed by federal courts. The consequences of inaction in the face of dangerous conditions can be grave. Teachers and administrators might face liability for omissions that lead to student injury. *See generally Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201-02 (5th Cir. 1994)(discussing the circumstances under which school officials may be liable for shooting deaths of students). And under appellants' proposed rule, the consequences of action would be as serious for educators as the consequences of inaction. An administrator contemplating discipline would face the threat of a lawsuit with all its attendant diversion of energy and resources from educational pursuits.

Appellants protest that, in the age of cell phones and e-mail, a bright-line rule requiring parental notification would hardly burden school officials. They also suggest that student welfare would be improved if parents were present during questioning. But these rejoinders miss the mark. When faced with imminent danger to the safety of their students, school officials may well find an immediate inquiry in the absence of a parent a necessary investigatory step. Federal courts should be wary of removing such devices from the disciplinary tool-box with the blunt instrument of constitutional decree. It would be a misfortune to exchange the informality of the school setting for the adversarial atmosphere of formalized procedure. Although the rule appellants urge may appear clear, it invites a series of derivative questions: What efforts must school officials make to contact parents? Must both parents be alerted? May officials proceed if the parents

cannot be reached? At what stage in an investigation must notification occur? Must parents be present at an interrogation or is notice alone sufficient? If their presence is required, how long do parents have to arrive before questioning can continue? And what exactly are the permissible limits on parents' roles once they appear? Expository litigation to answer such questions would stretch out and out.

We are not unsympathetic to appellants' claim that parental notification might maximize pupils' well-being. But a federal court is not the best forum to address such concerns. Appellants note that state law and school board rules provide rights and remedies that bear on this question. The Virginia Code states that "the principal or his designee shall . . . notify the parent of any student involved in an incident . . . [including] . . . the illegal carrying of a firearm . . . onto school property." *Va. Code Ann.* § 22.1-279.3:1 (Michie 2003). A school board rule requires the principal or his designee to make a "reasonable effort to contact the parent or guardian" before a law enforcement officer interrogates a student. J.A. 492. Wofford and M.D. might have pressed their grievances with the school board. Had they still been dissatisfied, they could have sought state judicial review of an adverse decision. *See Va. Code Ann.* § 22.1-87 (Michie 2003).

In the final analysis, the balance of rights and interests to be struck in the disciplinary process is a task best left to local school systems, operating, as they do, within the parameters of state law. The Supreme Court has recognized as much. *See Kuhlmeier*, 484 U.S. at 273. We are also mindful of the Court's warning that § 1983 should not become "a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul v. Davis*, 424 U.S. 693, 701 (1976). Notifying parents may be a good idea in many situations. But it is the province of legislation to embody good ideas, and it is not beyond the purview of state courts to apply state law as individual cases arise. A constitutional ruling, by contrast, preempts both legislative processes and state governance. By declining to extend the law in the manner that appellants urge, we respect the important democratic axiom that disputes should be resolved by those most intimately affected by them.

### III.

### A.

With these principles established, we proceed to address appellants' particular claims. Wofford alleges that the school officials' failure to contact her infringed her rights to due process. She notes that the Supreme Court has recognized a parental interest in the "care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Court has also required the state to comply with the procedural strictures of the Due Process Clause when it interferes with these interests. *See Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27-28 (1981).

Appellants find an interference with their liberty interests in the violations of school board policies and police regulations that they say occurred here. The Supreme Court has cautioned, however, that "the range of interests protected by procedural due process is not infinite." *Bd. of Regents v. Roth*, 408 U.S. 564, 570 (1972). The Constitution requires such protection "only when a decision of the State implicates an interest within the protection of the Fourteenth Amendment." *Ingraham*, 430 U.S. at 672. In this regard, we have held that violations of state law are insufficient by themselves to implicate the interests that trigger a due process claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 392 (4th Cir. 1990). State school board policies and police department regulations derive the basic legal authority they possess from state law. Appellants' suggestion that the putative violations of these local rules should dictate our due process analysis is thus without merit.

Certainly, state social services cannot deny parents custody of their children without notice and an adequate hearing. *See Stanley v. Illinois*, 405 U.S. 645, 658 (1972); *Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994). But the cases to which appellants point to establish their liberty interest all involve a change in the physical custody of the child. They evince an unquestioned familial interest in a child's general supervision and well-being, an interest most directly implicated in domestic custody disputes. Contrary to appellants' suggestion, *Stanley* and its progeny do not establish a parental stake in a child's freedom from temporary detention at school for disciplinary

purposes. Consequently, the procedures mandated by these decisions do not apply here. At all times during the investigation, M.D. remained on school property, under the auspices of school administrators. The Constitution does not impose a duty of parental notification before the pupil's disciplinary detainment while such school guardianship persists.

Our conclusion is strengthened by the absence of parental notification from the Supreme Court's discussion of students' due process rights. Referring to the procedures preceding a suspension of up to ten days, the Court indicated that "[t]here need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Goss*, 419 U.S. at 582. Of course, students' rights are conceptually distinct from parental interests in their children's liberty while at school. But if these latter concerns were expansive enough to require parental notification here, it would be odd for the Supreme Court to endorse a disciplinary procedure that ignores such apprisal before the student's suspension. *Accord Zehner v. Cent. Berkshire Reg'l Sch. Dist.*, 921 F. Supp. 850, 859 (D. Mass. 1995)("Plaintiffs have cited no law, and the Court has found none, which would indicate that notice to a student in such circumstances is inadequate unless it is provided to the student's parents as well.")

### B.

We next address appellants' Fourth Amendment claim. Appellee school administrators concede that, for the purposes of the Fourth Amendment, M.D. was seized on the day following Thanksgiving. They contest whether the pupil was seized on the day preceding the holiday. We shall assume arguendo that M.D. was seized on this occasion as well.

In most instances, the Fourth Amendment forbids searches and seizures of citizens absent a warrant supported by probable cause. *Katz v. United States*, 389 U.S. 347, 356-57 (1967). These strictures apply not only to law enforcement officers, but to all "activities of sovereign authority." *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). Searches of students conducted by school officials, however, are subject to a

lesser degree of procedural scrutiny. *T.L.O.*, 469 U.S. at 340; *DesRoches v. Caprio*, 156 F.3d 571, 574 (4th Cir. 1998). Such a search need only be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). This standard respects the interests that educators have in "maintaining security and order" in schools. *Id.* at 340.

The facts of *T.L.O.* involved only a search. But the policies underlying that decision easily support its extension to seizures of students by school officials. *See Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1012 (7th Cir. 1995); *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079 (5th Cir. 1995); *Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989). Educators are bound not only to instruct the children committed to their care but also to ensure their personal safety. It would be an odd state of affairs to tie school officials' hands merely because fulfillment of this mandate requires the detention, not the inspection, of a pupil. We thus address appellants' claim of illegal seizure under the rubric announced in *T.L.O.*

A search is justified at its inception when there are "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.*, 469 U.S. at 341-42. Analogously, a school official may detain a student if there is a reasonable basis for believing that the pupil has violated the law or a school rule.[2] Both the Botetourt

---

[2]Appellants repeatedly allege that the failure to contact Wofford rendered M.D.'s detention unlawful. Their premise is that a pupil's seizure is only reasonable if her parent is contacted first. We are not persuaded that *T.L.O.* supports this proposition. The Supreme Court never mentioned parental notice in its definitional discussion of reasonable searches. Indeed, the whole tenor of the opinion would be upset if such a requirement were engrafted. *See, e.g.*, *T.L.O.*, 469 U.S. at 340 ("How, then, should we strike the balance between the schoolchild's legitimate expectations of privacy and the school's equally legitimate need to maintain an environment in which learning can take place?"). Indeed, the Supreme Court has never indicated that parental concerns should inform the balancing of student privacy interests against educational and disciplinary goals. We therefore decline to consider parental involvement in assessing the lawfulness of a student seizure under *T.L.O.*

County School Board's rules and the Code of Virginia forbid students from carrying guns onto school grounds. *Va. Code Ann.* §§ 18.2-308.1, 22.1-277.07 (Michie 2003 & Supp. 2004). M.D.'s classmates' allegations, communicated to Rosa by their teacher, constituted a reasonable basis for believing that M.D. had violated these prohibitions. *See Edwards*, 883 F.2d at 884 (detention of student for questioning justified when two of his peers implicated him in a bomb threat). We have no reason to doubt the decision of school officials to credit the pupils' claims. Indeed, appellees' educational expertise and familiarity with the students involved invite deference to their judgment. M.D.'s detention on the day preceding the Thanksgiving holiday thus satisfied the first part of the *T.L.O.* test.

The seizure must also have been "reasonably related in scope to the circumstances which justified [it] in the first place." *T.L.O.*, 469 U.S. at 341 (quoting *Terry*, 392 U.S. at 20). The disciplinary interest in addressing the potential violation of school rules and the need to ensure the physical safety of pupils and staff validated the seizure of M.D. on the day preceding Thanksgiving. Rosa had reason to believe that the student had brought a gun to school. The assistant principal held M.D. no longer than necessary to address this allegation and confirm that she had no gun on her person or in her schoolroom desk. The student's seizure on the day preceding Thanksgiving thus satisfied the second part of the *T.L.O.* test. *See Hassan*, 55 F.3d at 1080 (unruly student who had disrupted school excursion properly detained until the excursion was completed).

On the day following the holiday, the school officials continued their investigation of the incident. The students who had accused M.D. the previous week reiterated their allegations. Josh Bane also claimed to have seen the appellant discard the gun in the environs of the campus. This information renewed the administrators' concern that M.D. had violated the weapons ban and explained Rosa's failure to discover a gun the week before. Disciplinary interests and the need to protect those at school from bodily harm again justified M.D.'s seizure following Bane's revelation. M.D.'s detention on the day following Thanksgiving thus satisfied the first part of the *T.L.O.* test.

Law enforcement officers, not school administrators, have a particular expertise in safely retrieving hidden weapons. It was eminently

reasonable, therefore, for the school to contact the police department once it became plausible that a handgun had been secreted in the school's environs. And since the safety of pupils and staff required the retrieval of any such weapon, it was also prudent for school administrators to hold M.D. until the police had completed their investigation. The school officials reasonably believed that she could identify the gun's location. Permitting M.D. to follow her normal school-day routine would have posed the unacceptable risk of her retrieving the weapon or revealing its location to a peer. The school officials detained the pupil no longer than necessary to obviate this dire possibility. Holding the student until the police had determined that no weapon was present thus satisfied the second part of the *T.L.O.* test.

The district court devoted much attention to the constitutional implications of the police involvement. Law enforcement officers may depart from the procedural strictures of the Fourth Amendment when they reasonably conclude "that criminal activity may be afoot." *Terry*, 392 U.S. at 30. Indeed, the constitutional standards governing police action in such circumstances match exactly those that regulate searches and seizures of students. *See T.L.O.*, 469 U.S. at 341 (quoting *Terry*, 392 U.S. at 20). School officials, unlike police, enjoy this discretion when addressing possible violations of school rules. *Id.* at 342. But when a student is suspected of also breaching a criminal law, both school officials and law enforcement officers may proceed under the lesser standards of *Terry*.

One consequence of this confluence of *Terry* standards is that, when school officials constitutionally seize a student for suspected criminal activity and transmit the basis for their suspicion to the police, any continued detention of the pupil by the police is necessarily justified in its incipience. This very sequence of events occurred here. The police officers' initial involvement in the incident, therefore, satisfied constitutional requirements.

Additionally, when the justification for the original detention includes a concern that also warrants police involvement, no violation of the Fourth Amendment occurs if the police detain the pupil while they allay this concern. The officers detained M.D. only until they had satisfactorily determined that the school's environs contained no

handgun. They did not, therefore, violate her rights under the Fourth Amendment.

Finally, we find no constitutional violation in the decision of school administrators to detain M.D. for a brief period after the police had departed and school had been dismissed. This action was within the officials' discretion and we are loath to second-guess their judgment as to whether discussions with students may prove more or less productive after the school day has ended.

## IV.

We appreciate fully the difficult nature of these interactions for appellants and indeed for the entire community of teachers, students, and parents at Colonial Elementary School. We cannot find constitutional fault, however, with the efforts of school officials to protect the lives and safety of children entrusted to their care. Weapons are a matter with which schools can take no chances. The actions here reflected the need to avert the greater tragedy and respected the reconciliation of rights and interests set forth in federal law. The judgment of the district court is

*AFFIRMED*.