**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-1288**

---

O.W.,

> Plaintiff – Appellant,

v.

MARIE L. CARR, police officer in her individual and official capacities; REID BAKER, assistant principal in his individual and official capacities; SCHOOL BOARD OF THE CITY OF VIRGINIA BEACH, VIRGINIA, a body corporate; CITY OF VIRGINIA BEACH, a body politic and corporate,

> Defendants – Appellees.

------------------------------

JUVENILE LAW CENTER; RISE FOR YOUTH; NATIONAL POLICE ACCOUNTABILITY PROJECT; ELECTRONIC PRIVACY INFORMATION CENTER,

> Amici Supporting Appellant.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Elizabeth W. Hanes, District Judge.  (2:21-cv-00448-EWH-LRL)

---

Argued:  October 31, 2024                          Decided:  April 9, 2026

---

Before AGEE, QUATTLEBAUM, and RUSHING, Circuit Judges.

---

Affirmed by published opinion.  Judge Agee wrote the opinion, in which Judge Quattlebaum and Judge Rushing joined.

---

**ARGUED:** Makiba Aletta Gaines, POLARIS LAW FIRM, Chesapeake, Virginia, for Appellant. Anne Catherine Lahren, PENDER & COWARD, PC, Virginia Beach, Virginia; Joseph Martin Kurt, OFFICE OF THE CITY ATTORNEY, Virginia Beach, Virginia, for Appellees. **ON BRIEF:** Richard H. Matthews, Andrew C. Harding, PENDER & COWARD, P.C., Virginia Beach, Virginia, for Appellees School Board of the City of Virginia Beach, Virginia and Reid Baker. Mark D. Stiles, Christopher S. Boynton, Gerald L. Harris, OFFICE OF THE CITY ATTORNEY, Virginia Beach, Virginia, for Appellees City of Virginia Beach and Marie Carr. Booth Marcus Ripke, NATHANS & RIPKE, LLP, Baltimore, Maryland; Marsha L. Levick, Riya Saha Shah, Vic F. Wiener, JUVENILE LAW CENTER, Philadelphia, Pennsylvania, for Amici Juvenile Law Center and Rise for Youth. Keisha James, Lauren Bonds, Eliana Machefsky, NATIONAL POLICE ACCOUNTABILITY PROJECT, Washington, D.C., for Amicus National Police Accountability Project. Megan Iorio, Tom McBrien, Jake Wiener, ELECTRONIC PRIVACY INFORMATION CENTER, Washington, D.C., for Amicus Electronic Privacy Information Center.

---

2

AGEE, Circuit Judge:

In 2019, O.W.—a 13-year-old male student at Kempsville Middle School in Virginia Beach, Virginia—received a sexually explicit photo from a female classmate. A few months later, he shared that photo with some other students during the school day. Teachers quickly caught wind of the matter and notified the Acting Assistant Principal, Reid Baker.

In response, Mr. Baker took O.W. out of class, asked him some questions, and searched the photo gallery of his phone. Mr. Baker also notified the police officer working at Kempsville, School Resource Officer Marie L. Carr, who then began a criminal investigation. After being questioned by Mr. Baker and Officer Carr, and after showing the explicit photo to Officer Carr, O.W. was criminally charged in juvenile court for possession of child pornography. State juvenile court proceedings followed, but the case against O.W. was ultimately dismissed after he completed the terms and conditions of the deferred disposition set by the juvenile court.

This lawsuit followed. O.W. sued Mr. Baker, Officer Carr, the Virginia Beach School Board, and the City of Virginia Beach (collectively, the Defendants), alleging violations of his Fourth, Fifth, and Fourteenth Amendment rights. The district court granted summary judgment to the Defendants on all of O.W.'s claims. He now appeals, charging the district court with various errors. For the reasons explained below, we affirm.

I.

A.

3

Like many school districts, Virginia Beach works with local authorities to maintain a modest police presence on school grounds. It memorialized this relationship with the Virgina Beach Police Department in a "Memorandum of Understanding" (MOU) in 2008. J.A. 132. The MOU was in effect on the day of the events underlying this lawsuit. [J.A. 205].

Under the MOU, the Virginia Beach Police Department agreed to station School Resources Officers (SROs) on school grounds. [J.A. 132]. The stationed SRO was tasked with patrolling the school building and general law enforcement. [*Id.*]. During the school day, the principal or school staff must immediately report any criminal activity to the SRO. [J.A. 134]. The MOU explains:

> The SRO will retain all applicable police powers on school property, including the authority to stop, question, interview and take appropriate law enforcement action in situations involving students, faculty and other persons. These law enforcement actions may be taken without prior notification or authorization of the school principal, although SROs are encouraged to notify school officials of the situation as soon as practicable.

J.A. 135. While the SRO is authorized to take law enforcement actions at the school, he or she is not responsible for the enforcement of school rules or regulations. [J.A. 133].

The MOU also provides that school officials "may conduct searches" of a student "when the student is within the school's jurisdiction[,]" and "when reasonable suspicion exists to believe that the student has violated or is violating either the Code of Virginia, the Code of the City of Virginia Beach or School Board Policy." J.A. 136. SROs, by contrast, may not search a student unless they have probable cause to believe the student is violating the law. J.A. 136. The MOU further states that SROs "will not become involved in student

4

or school searches which are conducted by school officials and are not supported by probable cause[,]" and "will not encourage or request a school official to act as the SRO's agent in conducting searches of students[.]" J.A. 136–37.

B.

While at school on March 5, 2019, O.W. showed at least two classmates a nude picture of A.F., a 14-year-old female student at Kempsville. He also later sent the photograph to another student, G.C. [J.A. 1131]. A.F. had sent the picture to O.W. months earlier via Snapchat, a messaging and social media application. [J.A. 939–40, 974.] According to O.W., "everyone was talking about" the photograph and "asking him . . . if A.F. had really sent it to him." *O.W. ex rel. Bass v. Sch. Bd. of the City of Va. Beach*, 656 F. Supp. 3d 596, 606 (E.D. Va. 2023).

Later that afternoon, a teacher reported to Mr. Baker that O.W. possessed an inappropriate and sexually explicit image of a female student. [J.A. 1131.] After receiving this report, Mr. Baker took O.W. out of class, brought him to Kempsville's printing room, and asked him if he had an inappropriate photo. [J.A. 1131.] O.W. responded "What are you talking about?" which prompted Mr. Baker to say, "Don't lie to me." J.A. 949.[1]

Following the questioning in the printing room, Mr. Baker took O.W. to the lobby of the school's guidance office. At Mr. Baker's request, O.W. wrote a statement describing what happened. Once O.W. finished, Mr. Baker read the statement and asked O.W. to redo

---

[1] Officer Carr was not present during this initial conversation.

5

it because it "did not make sense[,]" and "didn't give enough information."[2] J.A. 518, 632, 947. In the second statement, O.W. wrote: "I showed people the photo and that was my bad."[3] J.A. 1268.

After O.W. finished his second statement, Mr. Baker took him to a small room connected to the guidance office to ask him some more questions. *See* J.A. 385, 755 (estimating that the room was approximately 72 square feet). The door to the room was kept open, and Officer Carr entered after the questioning began and sat by the door. Although his memory of this specific incident was fuzzy, Mr. Baker testified that whenever he questioned students about a possible violation of the Student Code of Conduct, he would tell them that lying was a separate violation of the Code of Conduct. [J.A. 902–03].

During this round of questioning, Mr. Baker first asked O.W. what happened during lunch, believing that was when he showed other students the photo. [J.A. 387, 757]. O.W. replied that nothing happened during lunch. [J.A. 387, 757]. Mr. Baker told O.W., "We're going through our investigation, we're gathering more statements, and I'm getting a consistent story over here. Yours isn't just adding up." J.A. 387, 757. Eventually, O.W. clarified that he had shown other students the photo in class, not the lunchroom, and that he forgot he had the photo until he was on his phone during class. [J.A. 634]. When he

---

[2] Neither O.W. nor Mr. Baker recalled the exact contents of O.W.'s first statement. *See* J.A. 486–87 (Mr. Baker's testimony that he "possibl[y]" asked O.W. to write two statements); J.A. 518 (O.W.'s testimony that he wrote two statements but could not remember the contents of the first).

[3] According to O.W., he "did not say that the photograph was a nude image in [his] first statements," and he "did not say that A.F. was in the photograph in [his] first statements." *O.W.*, 656 F. Supp. 3d at 606 n.5 (quoting J.A. 675).

6

remembered he had it, he showed it to two students. [J.A. 294, 634, 883–84] O.W. also stated that one of those students, G.C., asked to use O.W.'s phone to call someone and then sent the photo from O.W.'s phone to his own device. [J.A. 294, 634] O.W. later admitted that he was the one who sent the picture to the other student, and then stated that he had since deleted the photo and no longer had it. [J.A. 294, 387, 634, 757]. At that point, Officer Carr chimed in, telling O.W. that "even if you deleted something, we can still find the image on your phone." J.A. 387, 753.

Mr. Baker asked O.W. if he still had his phone. [J.A. 634] O.W. confirmed he did and gave it to Mr. Baker who then looked through it. But Mr. Baker could not find the photo because it was in O.W.'s messages, not his main photo gallery. [J.A. 955]. Officer Carr asked Mr. Baker to put the phone in airplane mode and power it off. [J.A. 634] She then collected the phone as evidence, at which point Mr. Baker and Officer Carr left O.W. in the small room alone and stepped outside. [J.A. 387, 634, 753]. Officer Carr called the Commonwealth's Attorney and told her that a possible felony had been committed. [J.A. 929–30]. The attorney instructed her to charge O.W. and the other male student, G.C. [J.A. 930].

Officer Carr returned to the room where O.W. was waiting and, without Mr. Baker present, asked O.W. if he still had the photo on his phone. [J.A. 635] Officer Carr was armed, in uniform, and had her badge on display. [J.A. 388, 753] O.W. confessed that he still had the photo. [J.A. 635]. Officer Carr asked O.W. in a "commanding tone" to show her "the contents of [his] phone.". J.A. 675. O.W. complied by unlocking his phone, finding the photo, and showing it to Officer Carr. After seeing the photo, Officer Carr read O.W.

7

his *Miranda*[4] rights, arrested him, and took him to juvenile detention. [J.A. 390, 635, 753].

At some point, Officer Carr asked for and obtained O.W.'s written statement, as well as

A.F.'s and G.C.'s statements. [J.A. 389, 759].[5]

O.W. and G.C. were criminally charged in juvenile court. [J.A. 298.] During those

proceedings, O.W.'s counsel filed two suppression motions which were based on

arguments similar to those raised here—that Mr. Baker's questioning violated his Fifth

Amendment right against self-incrimination, and that the search of his phone violated his

Fourth Amendment right to be free from unreasonable searches and seizures. [*See* J.A. 298

(referencing state court records), 1133 (district court taking judicial notice of same)]. The

juvenile court denied these motions and the matter proceeded to trial. Following trial, the

juvenile court found that there was sufficient evidence to find O.W. guilty. [J.A. 298–99.]

Even so, it deferred disposition of the matter and imposed certain terms and conditions on

O.W. [J.A. 299.] Once O.W. completed those terms and conditions, the court dismissed

the case against him. *See* J.A. 299 (noting that the "case against O.W. was dismissed" after

he "successful[ly] complet[ed] the terms and conditions of the deferred disposition set by

the [juvenile] [c]ourt"); *O.W.*, 656 F. Supp. 3d. at 607 n.7; Va. Code Ann. § 16.1-

278.8(A)(5) (allowing for "defer[red] disposition" of "delinquency charge[s]" under

certain circumstances).

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] The record is somewhat murky as to whether O.W. immediately confessed. Mr. Baker stated that O.W. initially denied having the photo. [J.A. 904]. O.W. claims he immediately told Mr. Baker the truth. [J.A. 802]. In any event, O.W. eventually admitted to possessing the photograph.

C.

In March 2021, O.W.'s mother filed a pro se complaint on behalf of her son in the Eastern District of Virginia. [J.A. 1, 5]. The district court sua sponte ordered her to amend her complaint and told her that she could not represent her son pro se. [J.A. 1134.] O.W.'s mother eventually obtained counsel and filed an amended complaint. [J.A. 1134.]

The amended complaint asserted several categories of claims against Mr. Baker, Officer Carr, the City of Virginia Beach (the City), the School Board, and other school staff. Count I, brought under 42 U.S.C. § 1983, alleged that the School Defendants—i.e., all those but Officer Carr and the City—violated O.W.'s Fourth, Fifth, and Fourteenth Amendment rights. [J.A. 44]. Count II, also brought under § 1983, alleged that Officer Carr and the City (the City Defendants) conspired to violate O.W.'s rights. [J.A. 45] Counts III through VIII, which are not at issue on appeal, raised other constitutional and tort claims. [J.A. 47–51]. Counts IX and X asserted Monell[6] liability against the City and the School Board. [J.A. 51] Count XI, also not at issue on appeal, raised a Title IX claim. [J.A. 53]

The matter proceeded to discovery. The School Defendants and the City Defendants separately moved for summary judgment. O.W., meanwhile, moved for partial summary judgment. The district court denied O.W.'s motion and granted both of the Defendants' motions. [J.A. 1160–61.]

---

[6] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

The court began with Count I of O.W.'s complaint.[7] *O.W.*, 656 F. Supp. 3d at 612. As to the Fourth Amendment claim, the district court applied the test from *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), to hold that Mr. Baker's search of O.W.'s cell phone was constitutionally permissible. *See id.* at 612–14. The court then took up the Fifth Amendment portion of Count I. *See id.* at 614. After considering the totality of the circumstances, the district court held that O.W.'s confession was voluntary and that Mr. Baker did not violate his Fifth Amendment rights. *See id.* at 614–17. Given these findings, the court granted summary judgment to the School Defendants on Count I.

The district court next turned to Count II of O.W.'s complaint. *Id.* at 617. To support his claim that Officer Carr and the City conspired to deprive him of his Fourth, Fifth, and Fourteenth Amendment rights, O.W. primarily relied on the MOU between the City and the School Board. *See id.* The court observed that there was "clear[ly] . . . an agreement between the City and School Board to coordinate when responding to criminal activity[.]" *Id.* at 618. But it concluded that it was "unreasonable to infer, without more, that [the MOU] was an agreement to deprive [O.W.] of his constitutional rights." *Id.* To that end, the court noted that O.W. failed to "to point to anything in the MOU that was unlawful," or otherwise "explain how the terms of the MOU establish an agreement to deprive [him] of his

---

[7] The parties' briefing on this issue below included argument related to Officer Carr. But as the district court noted, the operative complaint (O.W.'s second amended complaint) did "not allege Fourth, Fifth, or Fourteenth Amendment violations against Officer Carr." J.A. 1142. It therefore declined to reach those arguments. *Id.*

constitutional rights." *Id.* The court therefore granted summary judgment to the City

Defendants on Count II.

Later in its opinion, the court turned to Counts IX and X of O.W.'s complaint. *Id.*

at 621. Finding that O.W. failed to "establish any [underlying] constitutional violation for

which the School Board or the City could be held liable under *Monell*[,]" the court granted

summary judgment to those defendants on Counts IX and X. *Id.*

Finally, the district court denied without prejudice O.W.'s motion to file a third

amended complaint and ordered him to "file a [t]hird [a]mended [c]omplaint within

thirty . . . days" if he desired to "continue the prosecution of his case" in the district court.

*Id.* at 623. Rather than heed the district court's instructions, O.W. filed a notice of appeal

on February 17, 2024—just three days after the district court issued its opinion. J.A. 1164–

65. Lacking a final judgment from the district court to review or a certification of an

interlocutory order, this Court dismissed O.W.'s original appeal. J.A. 1167–71; *see* 28

U.S.C. §§ 1291, 1292.

O.W. returned to district court, sought and received a final judgment, *see* J.A. 1174–

75, and then filed a timely notice of appeal on his second attempt, J.A. 1176. Armed with

the district court's final judgment, this Court now has jurisdiction under 28 U.S.C. § 1291.

## II.

The Court reviews de novo the district court's grant of summary judgment. *Belmora*

*LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 291 (4th Cir. 2021). Summary judgment

is appropriate when "the movant shows that there is no genuine dispute as to any material

11

fact and the movant is entitled to judgment as a matter of law." *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And a dispute is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248).

In applying this standard, the Court must "take the facts in the light most favorable to the [non-moving party] to determine the applicable questions of law and ignore any contrary factual claims." *Hensley ex rel. N.C. v. Price*, 876 F.3d 573, 579 (4th Cir. 2017). That entails drawing "all reasonable inferences" from those facts in the non-moving party's favor, *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc), and refraining from weighing the evidence or making credibility determinations, *Hensley*, 876 F.3d at 584 n.6.

## III.

O.W. raises four main arguments on appeal. First, he contends that Mr. Baker's search of his phone violated his Fourth Amendment rights. Second, he maintains that his confession to Mr. Baker was involuntary and therefore obtained in violation of his Fifth Amendment rights. Third, he argues that Officer Carr and the City conspired with Virginia Beach Public Schools to deprive him of his constitutional rights. And fourth, he claims that the City and the School Board are liable for their employees' unconstitutional conduct under *Monell*. We address each issue in turn.

12

A.

O.W. first argues that the district court's decision transgresses the Fourth Amendment on numerous grounds, including that *T.L.O.* does not authorize warrantless cell phone searches after *Riley*[8]. He also argues that *T.L.O.* is inapplicable here given the coordination between Kempsville school staff and law enforcement personnel. We find none of his arguments persuasive.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Courts have generally interpreted this language to prohibit searches absent a warrant supported by probable cause. *Katz v. United States*, 389 U.S. 347, 356–57 (1967).

Critical for this case, though, the Supreme Court has observed that the "school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *T.L.O.*, 469 U.S. at 340. Reasoning from the Fourth Amendment's "fundamental command" that all "searches and seizures be reasonable," the Supreme Court has established a "twofold inquiry" for determining the "legality of a search of a student." *Id.* at 340–41; *see id.*

First, courts "must consider 'whether the . . . [search] was justified at its inception.'" *Id.* at 341 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). Second, courts "must determine whether the search as actually conducted 'was reasonably related in scope to the

_____

[8] *Riley v. California*, 573 U.S. 373 (2014).

circumstances which justified the interference in the first place[.]'" *Id.* (quoting *Terry*, 392 U.S. at 20). A search of a student by a school official is "'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* at 341–42. And a search is "reasonably related in scope" to its justification when it is "not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

When a school official's search of a student and/or their effects is both "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference," it complies with the Fourth Amendment. *Id.* at 341–42.

1.

A straightforward application of *T.L.O.* confirms that Mr. Baker's search of O.W's phone was constitutionally permissible.

Mr. Baker's search was "justified at its inception," *id.* at 341, because by the time he searched the phone, he had both received a report that O.W. possessed an explicit photograph of a classmate *and* personally heard O.W.'s confession confirming the same. That information certainly provides "reasonable grounds for suspecting that [a] search" of O.W.'s phone would "turn up evidence that [he] violated or is violating [] the law or the rules of the school." *Id.* at 342; *see O.W.*, 656 F. Supp. 3d at 614. After all, possession of that sort of photograph is not only a violation of Virginia Beach City Public Schools Code of Conduct—it also violates a Virginia statute. *See O.W.*, 656 F. Supp. 3d at 614 (citing Virginia Beach City Public Schools Code of Conduct, Rule 9, which prohibits the

14

"[p]ossession of offensive materials such as nude photographs"); Va. Code Ann. § 18.2-374.1:1(C).

The search was also "reasonably related in scope to the circumstances which justified [it] in the first place[.]" *T.L.O.*, 469 U.S. at 341. Again, those circumstances involved O.W., a 13-year-old student, possessing and sharing an explicit photo of his 14-year-old classmate in school. *Id.* And the scope of the ensuing search involved Mr. Baker instructing O.W. to open his phone and then searching its photo gallery. That was eminently reasonable under these circumstances. As the district court observed, a phone's "photo gallery is a likely place for a photograph to be stored[.]" *O.W.*, 656 F. Supp. 3d at 614. Further, the narrow scope of the search was tailored to address the concerns underlying it—i.e., locating the photo and preventing further disruption of the school day. *See T.L.O.*, 469 U.S. at 340 ("[M]aintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures[.]"). While O.W. attempts to muddy the record on this point, *see infra* Part III.A.2, there is simply no evidence in the record to suggest that Mr. Baker's search went beyond the photo gallery.

2.

O.W. spends the bulk of his briefing challenging the district court's Fourth Amendment holding. His arguments fall into one of two categories: (1) *T.L.O.* is inapplicable on these facts, and (2) even assuming *T.L.O.* applies, the search was unlawful. Neither claim holds water.

Beginning with the first category, O.W. primarily argues that our analysis should be guided by the Supreme Court's decision in *Ferguson v. City of Charleston*, 532 U.S. 67

15

(2001)—not *T.L.O.* But that case has no application here. Briefly, *Ferguson* involved a task force made up of police officers, local officials, and staff from the Medical University of South Carolina, which established a policy of identifying and testing pregnant patients for evidence of drug use without any individualized suspicion. *See id.* at 70–76. After "weigh[ing] the intrusion on the individual's interest in privacy against the 'special needs' that supported the program[,]" the *Ferguson* Court ultimately held that the program violated the Fourth Amendment. *Id.* at 78; *see id.* at 86 ("The Fourth Amendment's general prohibition against nonconsensual, warrantless, and *suspicionless* searches necessarily applies to [this] policy." (emphasis added)).

O.W. seeks to analogize the task force in *Ferguson* to the relationship between Virginia Beach Public Schools and the Virginia Beach Police Department. But O.W. overlooks a key difference between the two cases—*Ferguson* involved the permissibility of *suspicionless* searches. *See id.* at 76–86. Here, there is (rightly) no allegation that Mr. Baker searched O.W.'s phone without suspicion.[9] So contrary to O.W.'s arguments, *Ferguson* is inapposite on its face.

O.W. also makes much of Officer Carr's involvement in Mr. Baker's search of his phone: "The district court [] erred when it applied *T.L.O.* to test the legality of the search

---

[9] Abandoning the *T.L.O.* test in favor of a more free-flowing "special needs" inquiry would also run contrary to decades of caselaw and the reasoning underlying *T.L.O. See T.L.O.*, 469 U.S. at 341–42 (establishing a two-part test specifically for use in determining the reasonableness of a search in the *school setting*); *see also Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370–77 (2009) (applying the *T.L.O.* test); *Wofford*, 390 F.3d at 326 (noting that the *T.L.O.* standard seeks to "respect[] the interests that educators have in 'maintaining security and order' in schools").

16

[here] which was conducted in conjunction with the police for criminal investigatory purposes." Opening Br. 20. To be sure, the Supreme Court in *T.L.O.* did not purport to answer the question of "the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies[.]" *T.L.O.*, 469 U.S. at 341 n.7. Still, several pitfalls doom this portion of O.W.'s argument.

To begin, the undisputed record shows that Mr. Baker *did not* search O.W.'s phone "at the behest of" Officer Carr. Much the opposite—Mr. Baker detained O.W. on his own authority, questioned O.W. himself (and then led the questioning once Officer Carr was later present), and asked for O.W.'s phone without any prompting from Officer Carr. There's simply no evidence that Officer Carr solicited or directed this course of conduct. And hard as he may try, O.W. cannot overcome this lack of evidence with conclusory allegations. *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) ("Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.").

Nor is there any evidence that Mr. Baker's search was "in conjunction with" law enforcement as that phrase is used in *T.L.O.* For a search to be "in conjunction with" law enforcement, there must be some contemporaneous law enforcement activity. *See Conjunction*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/conjunction [https://perma.cc/7BD4-EVRE] ("Occurrence

17

together in time or space: Concurrence."). But that didn't happen here. Rather, Officer Carr sat by while Mr. Baker searched O.W.'s phone; she did not search it with him.[10]

Perhaps sensing the infirmities in his first batch of arguments, O.W. takes a different tack with his second. He assumes that *T.L.O.* applies, but then argues that the search of his phone was still unlawful for two reasons: (1) it was not justified at its inception and the scope of the ensuing search is unknown, so it fails *T.L.O.*'s reasonableness test; and (2) recent Supreme Court precedent—particularly, *Riley v. California*, 573 U.S. 373 (2014)— suggests that *T.L.O.* does not authorize warrantless cell phone searches in the school setting. We disagree on both fronts.

Beginning with the former, and for the reasons already outlined above, Mr. Baker's search was both justified at its inception and reasonable in scope. O.W. mainly takes issue with the purportedly unknown scope of Mr. Baker's search. But as O.W. concedes, "[t]he record does not contain any admissible evidence regarding the scope of the search." Opening Br. 31. Instead, we have only O.W.'s unsubstantiated allegation that Mr. Baker "searched the photo gallery of [his] phone." J.A. 30. Without more, the only reasonable

---

[10] True, Officer Carr asked to seize the phone after Mr. Baker searched it and Mr. Baker delivered it to her. But mere after-the-fact delivery of incriminating evidence to law enforcement does not turn a school official's standalone search into one performed "in conjunction with" law enforcement. Otherwise, *T.L.O.* would have come out differently. *See* 469 U.S. at 328–29 (teacher turned over evidence of marijuana dealing to the police). In addition, Mr. Baker was not present when Officer Carr later returned to O.W. and asked him to show her the photo.

And to the extent O.W. takes issue with Officer Carr's use of O.W.'s phone, that issue is not before us on appeal. Again, he brings no Fourth, Fifth, or Fourteenth Amendment claim against Officer Carr. So for the purposes of this appeal, we need only find that Mr. Baker acted on his own authority and not as a front for police activity.

inference we can draw is that Mr. Baker—at most—navigated (or watched O.W. navigate) to the photo gallery and then perused it to look for the photograph. Such a limited search was certainly reasonable given the circumstances justifying it (i.e., allegations of child pornography and the distribution thereof in school).

O.W.'s second argument poses a more complicated question. He correctly points out that the Supreme Court has proceeded cautiously when dealing with warrantless searches of cell phones. In *Riley*, 573 U.S. 373, for instance, the Supreme Court held that "a warrant is generally required before" police officers may search "the information on a cell phone," "even when [that] cell phone is seized incident to arrest." *Id.* at 401. It reached that conclusion by "assessing, on the one hand, the degree to which [a given search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 385 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

In the wake of *Riley*, there's an argument that school officials should obtain a warrant before searching a student's cell phone, *T.L.O.* notwithstanding. *See, e.g.*, *Jackson v. McCurry*, 762 F. App'x 919, 927 (11th Cir. 2019) (unpublished) ("[B]ecause the reasoning of *Riley* treats cellphone searches as especially intrusive . . . , a search of a student's cellphone might require a more compelling justification than that required to search a student's other personal effects under *T.L.O.*"). After all, *T.L.O.* was decided well before the advent of cell phones. So even though it accounted for the privacy interests present *at the time*, *see* 469 U.S. at 339 (listing examples of personal effects in which a

19

student may have a privacy interest), it did not account for the unique privacy interests attendant to cell phones, *see Riley*, 573 U.S. at 393–95.

In any event, O.W. has waived this issue. *See* Opening Br. 32–33; Reply Br. 19. His entire argument on brief is as follows: "*Terry* does not justify cellular phone searches under *Riley v. California*, . . . and this Court should hold that *T.L.O.* does not justify cellular phone searches of students on school grounds on mere reasonable suspicion." Opening Br. 33; *see* Reply Br. 19 (same). Such a fleeting mention of *Riley*'s impact on *Terry* and *T.L.O.* is exactly the sort of "passing shot at [an] issue" that this Court has deemed to be waiver. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (cleaned up) (holding that a party waived an argument by "assert[ing it] without [any] argument or explanation"); *see Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 152 n.4 (4th Cir. 2012) (finding that an argument was waived after a party briefly mentioned it but "fail[ed] to develop [it] to any extent in its brief"). Accordingly, O.W. has waived this *Riley*-based argument for reversal.[11]

But even if O.W. had preserved his *Riley* argument, we're not persuaded that he's right. *Riley* was, at bottom, a reasonableness case. As the Supreme Court acknowledged early in its opinion, "the ultimate touchstone of the Fourth Amendment is

---

[11] The fact that amici more thoroughly address this issue doesn't help O.W. *United States v. Buculei*, 262 F.3d 322, 333 n.11 (4th Cir. 2001) ("[A]n issue waived by appellant cannot be raised by amicus curiae." (quoting *Christopher M. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991)); *see Amoco Oil Co. v. United States*, 234 F.3d 1374 ("Because these constitutional arguments were not raised in [the] opening brief, we decline to address them. . . . [A]n appellant and an amicus may not split up the issues and expect the court to consider that they have all been raised on appeal.").

'reasonableness.'" *Riley*, 573 U.S. at 381 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). It then applied that principle by balancing the competing interests involved when an individual's cell phone is searched incident to arrest. *See id.* at 385–91. After balancing those interests, the Supreme Court held that warrants are "generally" required to search cell phones. *Id.* at 386. While various considerations animated the Court's analysis, one finding was central to its conclusion: that the reasons for the search incident to arrest exception do not "ha[ve] much force with respect to digital content on cell phones." *Id.*; *see id.* ("On the government interest side . . . the two risks [underlying the search incident to arrest exception]—harm to officers and destruction of evidence—[are not present] when the search is of digital data."); *id.* at 393 (explaining that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of" the other types of physical items commonly searched incident to arrest). And notably, the Supreme Court in *Riley* made no inference of its impact on *T.L.O.* or its application to the school setting.

*T.L.O.* involved a similar reasonableness analysis. The Supreme Court first identified the competing interests at play—"the schoolchild's legitimate expectations of privacy and the school's equally legitimate need to maintain an environment in which learning can take place[.]" *T.L.O.*, 469 U.S. at 340. It then "str[uc]k[] the balance" between these interests by "dispens[ing] with the warrant requirement" in the school setting. *Id.* It did so because "requiring a teacher to obtain a warrant before searching a child suspected of an infraction of school rules (or of the criminal law) would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools." *Id.*;

21

*see id.* at 342–43 (establishing a two-part test for school searches and stating that "this standard will . . . neither unduly burden the efforts of school authorities to maintain order in their schools nor authorize unrestrained intrusions upon the privacy of schoolchildren").

Read together, it's hard to see how *Riley*—a case about police officers searching cell phones incident to arrest—necessarily upends *T.L.O.*—a case about school officials searching students and their belongings. In each instance, the Supreme Court conducted a flexible, fact-specific reasonableness analysis to reach its conclusion. And critically, different concerns drove the analysis in each case. Given those different concerns, we're not persuaded that *Riley* undermines *T.L.O*, particularly in this case. A few other observations support this conclusion.

To start, *Riley* explicitly discounted the notion that its holding applied across the board. *See* 573 U.S. at 401–02 ("[E]ven though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone."); *Jackson*, 762 F. App'x at 927 ("[*Riley*] did not attempt to spell out how its holding could be transposed to the setting of a public school."). That alone makes us hesitate to find that *Riley* extends to school setting, especially since federal courts should be wary of "removing [] devices from the disciplinary tool-box with the blunt instrument of constitutional decree." *Wofford v. Evans*, 390 F.3d 318, 324–25 (4th Cir. 2004).

Moreover, *Riley*'s rationale does not neatly map on to the school setting. To reiterate, that decision flowed from the Supreme Court's recognition that the reasons for the search incident to arrest exception—protecting police officers, preventing the

22

destruction of evidence, and arrestees' reduced privacy interests—lacked force "with respect to digital content on cell phones." *Riley*, 573 U.S. at 386. By contrast, *T.LO.*'s rationale—that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures"—has not been undermined by the advent of cell phones, as the facts of this case reflect. *T.L.O.*, 469 U.S. at 340. Were school officials unable to promptly and flexibly intervene, O.W. and others may have continued to share in school the explicit photo of A.F. Not only would that have been illegal and against school policy, it also would have further harmed A.F. and continued to disrupt the school and its students. *T.L.O.* exists to enable school officials to prevent that sort of situation. *See id.* at 339–40.

That students have reduced privacy interests while at school also bears on our analysis. *See T.L.O.*, 469 U.S. at 338–43; *Wofford*, 390 F.3d at 322–23. Students in school are not free to go wherever they want or behave however they please. The same is true as it relates to their electronic devices. In fact, many school districts—including Virginia Beach Public Schools—require students and parents to sign an electronic device policy. At the time of the events here, Virginia Beach's policy provided that, while students are allowed to bring their device, their use of it may be limited or revoked. *See* J.A. 128. These sorts of policies certainly do not provide school officials *carte blanche* to search students' devices in all circumstances. But they no doubt bear on the *T.L.O.* reasonableness analysis, as the policies provide notice that (1) students' privacy interests with respect to their cell phones are somewhat curtailed, and (2) remedial actions may be taken if phones are misused.

23

For all these reasons, we hold that *Riley* does not displace *T.L.O*, and that *T.L.O.* directly controls this case.[12]

\* \* \*

In short, O.W. has failed to demonstrate that Mr. Baker's search of his phone violated the Fourth Amendment. The district court correctly found as much and thus did not err in granting summary judgment to the School Defendants on O.W.'s Fourth Amendment claim.

B.

O.W. also maintains that his confession to Mr. Baker was involuntary under the Fifth Amendment's Self-Incrimination Clause and the Fourteenth Amendment's Due Process Clause.[13] Because the district court found otherwise, he argues we must reverse its decision. We disagree.

The Fifth Amendment, as applied to the States through the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964), commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend V. To determine whether a confession was voluntary, the Court must consider whether it was the "product

---

[12] While *Riley* might apply in a very different factual setting, it doesn't affect the outcome here. The bottom line is that Mr. Baker had a compelling justification to search O.W.'s phone—a serious code of conduct (and criminal law) violation. And his search appears to have been narrowly tailored to serve that justification. Mr. Baker's search would thus be constitutional *even if* a more exacting standard applied to his conduct. *See Jackson*, 762 F. App'x at 927.

[13] Our inquiry is the same under either provision. *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997). We therefore discuss them interchangeably.

of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *United States v. Giddins*, 858 F.3d 870, 881 (4th Cir. 2017) ("Coercive police activity is a necessary finding for a confession . . . to be considered involuntary."). That said, the "mere existence of threats . . . implied promises, improper influence, or other coercive police activity [] does not automatically render a confession involuntary." *Giddins*, 858 F.3d at 881 (cleaned up).

In conducting a voluntariness inquiry, courts must consider "the totality of all the surrounding circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Among the factors to be considered are the individual's age, education, whether a *Miranda* warning was given,[14] the length of the detention and questioning, and the use of physical punishment. *Id.*; *see J.D.B. v. North Carolina*, 564 U.S. 261, 270–72 (2011); *Haley v. Ohio*, 332 U.S. 596, 599 (1948) (noting that "special care" must be exercised in applying the voluntariness test to children).

Three additional points before turning to the analysis: First, "the voluntariness of [a] confession is not to be equated with the absolute absence of intimidation." *United States v. Braxton*, 112 F.3d 777, 783 (4th Cir. 1997) (internal quotation and ellipses omitted). "[P]olice are allowed to play on a suspect's ignorance, fears and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision

---

[14] Failing to issue a *Miranda* warning, without more, is not actionable under 42 U.S.C. § 1983. That's because the failure to provide such warning is not a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." *Vega v. Tekoh*, 597 U.S. 134, 141 (2022).

becomes impossible." *United States v. Sablotny*, 21 F.3d 747, 752 (7th Cir. 1994) (citing *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990)).

Second, "truthful statements about the defendant's predicament," including descriptions of the consequences for dishonesty, generally do not render confessions involuntary. *Braxton*, 112 F.3d at 782 (internal quotation and brackets omitted).

And third, whether a confession is voluntary is "a legal question requiring independent . . . determination." *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (quoting *Miller v. Fenton*, 474 U.S. 104, 110 (1985)). There are, of course, subsidiary factual questions relevant to this determination. *See Schneckloth*, 412 U.S. at 226; *Miller*, 474 U.S. at 112. But the ultimate question of voluntariness remains a legal one.

Applying these principles, we hold that Mr. Baker did not violate O.W.'s Fifth Amendment rights.

To begin, we note that O.W.'s failure to bring this claim directly against law enforcement is not fatal. Although one must generally establish "coercive *police* activity" to support a Fifth Amendment claim, *Giddins*, 858 F.3d at 881 (emphasis added), courts have recognized that the Fifth Amendment may be implicated during interviews conducted by school officials, particularly when police officers are also involved. *See, e.g.*, *J.D. v. Commonwealth*, 591 S.E.2d 721, 726 (Ct. App. Va. 2004); *see also, e.g.*, *In re D.A.H.*, 857 S.E.2d 771, 782 (Ct. App. N.C. 2021).[15]

---

[15] There is a relative dearth of federal caselaw on the issue of school interrogations. There are, however, numerous state law cases discussing the federal issues that arise from such incidents. This discrepancy likely results from the fact that many proceedings (Continued)

Here, we find that Mr. Baker did not overbear O.W.'s will and force a confession. To start, O.W. was questioned in the middle of the day for a relatively short period of time.[16] *Contra Haley*, 332 U.S. at 599–601 (confession involuntary in part because 15-year-old was arrested and interrogated in the middle of the night from midnight to 5 a.m.). And the questioning was led by a school official in a familiar setting—the school guidance office. *C.f. United States v. Carter*, 300 F.3d 415, 423 (4th Cir. 2002) (suggesting that a familiar setting cuts against a finding of involuntariness).

Mr. Baker did not threaten O.W. in any way, nor did he deprive him of food, water, or other necessities. True, Mr. Baker did tell O.W. that he needed to be honest, and that dishonesty would constitute a separate violation of the Code of Conduct. Mr. Baker also shared that other students' description of events did not match O.W.'s. But truthfully relaying that sort of information does not amount to unconstitutional coercion. *See Braxton*, 112 F.3d at 782 (noting that "truthful statements about the defendant's predicament" generally do not render confessions involuntary (cleaned up)); *United States v. Holmes*, 670 F.3d 586, 592–93 (4th Cir. 2012) (recognizing that situations that make an individual "'uncomfortable' or create a 'predicament' for a defendant are not [inherently] coercive" (quoting *United States v. Pelton*, 835 F.2d 1067, 1072 (4th Cir. 1987)).[17]

---

involving juveniles begin in state juvenile court and proceed through the state courts, rather than the federal courts.

[16] Although the record is unclear on how long Mr. Baker questioned O.W., it was less than two hours based on when he called O.W. to his office and when he called O.W.'s mother. [J.A. 352, 356, 681, 685-686].

[17] That Mr. Baker instructed O.W. to write—and then rewrite—a statement of events does not change our conclusion. O.W. does not allege that Mr. Baker made him confess in (Continued)

We also acknowledge O.W.'s relative youth. *Cf. J.D.B.*, 564 U.S. at 277 ("This is not to say that a child's age will be a determinative, or even a significant, factor in every case. . . . It is, however, a reality that courts cannot simply ignore."). At the time he was questioned, O.W. was 13 years old. He was also alone, unaccompanied by a parent. Had Mr. Baker's conduct been more coercive than it was, O.W.'s age may have made this a closer case. But in the end, even a boy as young as 13 can choose between truth and falsehood when he is simply asked to recount what happened.

O.W. disagrees with our assessment of whether his will was overborne. He also claims that we're not entitled to make that assessment in the first place. In O.W.'s view, whether his will was overborne is a question of fact for a jury, so it was inappropriate for the district court to grant the School Defendants summary judgment on this claim. Yet while it's true that voluntariness is a fact-specific inquiry, it is not, at bottom, a factual question. *See Fulminante*, 499 U.S. at 287 ("[T]he ultimate issue of 'voluntariness' is a legal question[.]" (quoting *Miller*, 474 U.S. at 110 (1985)). Courts are thus empowered to rule on the voluntariness issue as a matter of law when, as here, the undisputed facts allow for only one conclusion.

We last note that, in conducting this analysis, we do not create a one-size-fits-all, school-specific test for assessing the voluntariness of a confession. No doubt, the setting

---

the written statement, only that he told him to provide a detailed account of what happened. And when O.W.'s first statement was nondescript, Mr. Baker simply told him to redo it. O.W. points to no authority holding that a written medium is somehow more coercive than, for example, follow-up questioning to an ambiguous or incomplete oral statement.

28

of the events here requires us to exercise caution. Otherwise we run the risk of "exchang[ing] the informality of the school setting for the adversarial atmosphere of formalized procedure." *Wofford*, 390 F.3d at 324; *see id.* ("[T]he balance of rights and interests to be struck in the disciplinary process is a task best left to local school systems, operating, as they do, within the parameters of state law. . . . [Section] 1983 should not become 'a font of tort law to be superimposed upon whatever systems may already be administered by the States.'" (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)).

Regardless, standard Fifth and Fourteenth Amendment principles are sufficient to guide our analysis. And under the circumstances presented here, we find that O.W.'s confession was voluntary. *See Boynton v. Casey*, 543 F. Supp. 995, 997–98 (D. Me. 1982) (declining to find a Fifth Amendment violation where a student was primarily questioned by school officials); *cf. In re D.A.H.*, 857 S.E.2d at 778 ("[A] student simply being questioned by a principal would not generally qualify as a custodial interrogation."). Because our holding on this issue is in accord with the district court's, we affirm its decision.

## C.

Next up is O.W.'s civil conspiracy claim. The district court held that O.W. failed to establish the elements of a 42 U.S.C. § 1983 conspiracy and so granted summary judgment for the City Defendants on this claim. Finding no error, we affirm.

"To establish a civil conspiracy under § 1983, [a plaintiff] must present evidence that the [defendants (1)] acted jointly in concert and [(2)] that some overt act was done in furtherance of the conspiracy which [(3)] resulted in [the plaintiff's] deprivation of a

constitutional right[.]" *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) (citing *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992)).

While "direct evidence of a meeting of the minds" is not required, a plaintiff must at least come forward with "specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Id.* (citing *Hafner*, 983 F.2d at 576–77). In other words, "to survive a properly supported summary judgment motion, [the plaintiff]'s evidence must, at least, reasonably lead to the inference that [the defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.* This is a "weighty burden," and one that O.W. has failed to carry. *Id.*

Setting aside the issue of whether he was at any time deprived of a constitutional right, the record lacks any evidence that the alleged members of the conspiracy "came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.* Rather, the record reflects that (1) Mr. Baker acted to resolve an issue that was causing a disruption at school, and (2) Officer Carr conducted a parallel investigation because the potential school code violations were *also* criminal law violations. The record does not, however, indicate any coordination between the members of the alleged conspiracy to accomplish some unlawful, "conspiratorial objective." *Id.*

O.W. seeks to avoid this conclusion by (1) ascribing unlawful motives to the alleged conspirators without factual support, and (2) claiming—again without factual support— that the "record is teeming with direct evidence" of unlawful "concerted conduct." Opening Br. 38. The crux of O.W.'s argument is that the parties conspired to leverage the lesser

30

constitutional burdens imposed on school administrators to short-circuit the criminal investigative process. Yet, while it's "clear that there was an agreement between the City and School Board to coordinate when responding to criminal activity," it is unreasonable to infer—without more—that this coordination constituted a nefarious "agreement to deprive [O.W.] of his constitutional rights." *O.W.*, 656 F. Supp. 3d at 618. And tellingly, O.W. *still* fails to point to anything tangible in the record to support his conspiracy claim. His conclusory assertions regarding intent cannot stand in for *actual evidence* of an unlawful, conspiratorial objective.[18]

In sum, O.W.'s speculative arguments cannot carry the day. O.W. bears a heavy burden in attempting to establish a civil conspiracy under § 1983, and his conclusory allegations and arguments are insufficient to meet that burden. We therefore affirm the district court's grant of summary judgment to the City Defendants on this issue.[19]

D.

---

[18] O.W. likewise fails to point to anything in the MOU that is actually unlawful. Nor does he explain how the terms of the MOU establish an agreement to deprive him of his constitutional rights.

[19] O.W. also argues that the district court "erroneously treated conspiratorial intent as an additional element of a prima facie § 1983 claim." Opening Br. 38. Not so. The district court was merely paraphrasing the language from *Hinkle* that elaborated upon the type of evidence required to support a civil conspiracy claim. *Compare O.W.*, 656 F. Supp. 3d at 617 ("To establish conspiratorial intent, [plaintiff's] evidence must, at least, reasonably lead to the inference that [defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." (quoting *Hinkle*, 81 F.3d at 421)), *with Hinkle*, 81 F.3d at 422 (noting that a § 1983 conspiracy plaintiff must adduce evidence giving rise to a reasonable inference that "each alleged conspirator shared the same conspiratorial objective").

We last consider O.W.'s *Monell* claim. The district court granted summary judgment for the City and the School Board on the grounds that O.W. failed to establish any constitutional violation for which either could be held liable under *Monell*. We agree.

Under *Monell*, a municipality can be held liable for constitutional violations "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible [for] under § 1983." *Hunter v. Town of Mocksville*, 897 F.3d 538, 554 (4th Cir. 2018) (citing *Monell*, 436 U.S. at 694).

For the reasons outlined above, O.W. has failed to establish any constitutional violation. And in the absence of a constitutional violation, O.W.'s attempt to hold the City and the School Board liable under *Monell* is a nonstarter. *See Hunter*, 897 F.3d at 554; *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987) (noting that an underlying constitutional violation is a prerequisite for a *Monell* claim to prevail). We need go no further.

## IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

32